Jodi L. CARR, Guardian of the Person of Bradley H. Carr, Appellant–Respondent,

v.

Lee CARR, Guardian of the Person of Bradley H. Carr, Appellee–Petitioner.

No. 79A02–9703–CV–131.

Court of Appeals of Indiana.

Sept. 5, 1997.

Lisa A. Stone, Debra H. Miller, Ice Miller Donadio & Ryan, Indianapolis, for Appellant–Respondent.

Loretta H. Rush, Jerome L. Withered, Angela M. Service, Withered & Corrigan, Lafayette, for Appellee–Petitioner.

## OPINION

ROBERTSON, Judge.

Jodi L. Carr [Daughter], Co–Guardian of the Person of Bradley H. Carr [Carr], appeals the trial court's granting of the petition filed by Lee Carr [Uncle], the other Co–Guardian of the person of Bradley H. Carr, to move Carr from a nursing home in Indianapolis to a nursing home in Lafayette, Indiana, which required that Carr's code status be reduced. Daughter also appeals the trial court's removal of her as the guardian over Carr's estate and the appointment of the Lafayette Bank and Trust Company as the successor trustee. Daughter raises three issues with multiple subparts, which we restate and expand into four, none of which constitute reversible error.

## FACTS

The facts in the light most favorable to the trial court's judgment reveal that, on June 7, 1994, Carr sustained catastrophic personal injuries in an automobile accident which left him incapacitated and institutionalized in a nursing home. Daughter, Carr's only child and heir, petitioned for, and was appointed, guardian over Carr's person and estate. Daughter retained Key Bank to administer the estate.

After the accident, Carr was placed in a nursing home in Indianapolis where Daughter lives. However, Daughter has rarely visited with Carr. In fact, Daughter has had almost no contact with Carr since her parents' divorce which took place when Daughter was one year-old.

Carr's uncle [Uncle], who lives in Tippecanoe County, has visited Carr approximately once a week. Carr's girlfriend, who also lives in Lafayette, visits Carr almost every day. Uncle became concerned about Carr's circumstances and desired to move Carr to a nursing home in Lafayette where Uncle, other family members, and Carr's girlfriend, could better care for Carr and better monitor his nursing home care. Uncle petitioned the trial court for Daughter's removal as guardian of Carr's person.

On February 20, 1996, Daughter and Uncle entered into a settlement agreement, which the trial court entered as an order on the docket, which provided that Daughter and Uncle would serve as co-guardians over Carr's person, and Daughter would remain guardian over Carr's estate. The agreement/order also provided in pertinent part as follows:

[Uncle and Daughter] both agree that none of the following actions will be taken without the consent of both of them or court approval:

a. any change in [Carr's] code designation;

b. any change in [Carr's] doctors or treating facilities, except on an emergency basis;

\* \* \* \* \* \*

[Uncle] shall not request, from [Daughter] or the estate, payment to him of any fees in connection with his service as co-guardian.

4. [Uncle] will have the responsibility to maintain regular contact with [Carr's] treating facility and to personally attend all doctor's meetings and case conferences, . . .

5. [Uncle] will have the right to investigate alternative treatment facilities, including investigating the risk, feasibility, and desirability of moving [Carr] to Lafayette. [Uncle] will report all of his findings and recommendations in a timely fashion to [Daughter] . . . Both [Daughter and Uncle] agree that a decision regarding such a move should be made as soon as possible after resolution of the lawsuit set forth [below], but in no case later than November 1, 1996. Such move will not be made without the consent of both of them and will not be made if it is determined by the doctors of [Carr] that such a move might be detrimental to the health of [Carr].

\* \* \* \* \* \*

7. [Key Bank] has been retained to manage the estate assets of [Carr] and shall continue to manage such estate assets until such time that [Uncle] consents to, or the court appoints, another financial fiduciary to manage such estate assets.

[Daughter] will remain the guardian of the estate of [Carr] and, as such, will have the sole right, authority, and responsibility to control all aspects of [Carr's] personal injury lawsuit . . . currently pending in Marion Superior Court No. 3 . . . [Daughter] and/or [Key Bank] shall submit timely reports to [Uncle] regarding the status of such lawsuit and the financial status/activity of the estate funds. Reports from [Key Bank] shall include monthly reports on the financial activity of the estate assets.

8. In the event that [Daughter and Uncle] are unable to agree on any one of the matters referenced in this document that require their agreement, the Court will resolve the disagreement in the best interests of [Carr], with no presumption of correctness in favor of either [Daughter or Uncle].

On October 9, 1996, the trial court granted Daughter's request to settle the personal injury lawsuit stemming from the accident which had left Carr incapacitated. The settlement increased the value of Carr's estate from approximately $250,000.00 to $2,500,000.00.

On November 13, 1996, Uncle filed a petition requesting that Daughter be removed as the guardian of Carr's estate. On November 18, 1996, Daughter filed an accounting with the trial court. In the accounting, Daughter requested a fee in excess of $12,000.00 billed at the rate of $80.00 per hour for the performance of largely ministerial services to the estate.

Uncle petitioned the trial court to appoint a Guardian Ad Litem [GAL] to represent Carr and determine whether Carr should be moved to Lafayette. The GAL determined that Carr benefitted greatly from visits and interaction with friends and family, and that Carr had demonstrated some improvement in his condition due to the hours of time spent with him by others. The GAL and Uncle noted that Carr was usually alert during visits and could move his head and hands when requested to do so. The GAL determined further that the care Carr received in the Indianapolis nursing home had been unsatisfactory, noting that Carr's room had

been very dirty. Moreover, Carr had received an injury to his shoulder which his health care providers had not noticed. Carr's girlfriend discovered the injury and reported it to nursing home officials. The injury was serious enough to require that Carr be transferred to a hospital for treatment. The GAL determined that Daughter had visited with Carr only a handful of times since she was appointed guardian. The GAL noted that the primary source of Carr's companionship had been provided by Carr's girlfriend who had driven down from Lafayette to Indianapolis nearly every day and had spent countless hours with Carr, talking with him, coloring with him, and grooming him— care that nursing home personnel could not be expected to provide. The GAL determined that Carr's best interests would be served by moving him to Lafayette where those who cared for him could more easily visit with him and better monitor his nursing home care.

Uncle desired to move Carr to a particular nursing home in Lafayette. The nursing home, however, would not accept Carr unless his code status was lowered from "A" to "C." An "A" code status requires health care providers to immediately pursue aggressive lifesaving treatment should the patient experience medical complications. With a "C" code status, the health care providers consult with the patient's family to determine whether the aggressive treatment options are to be pursued.

Other than the code status change, no other impediment stood in the way of having Carr moved to the Lafayette nursing home. Doctors had been contacted who were willing to provide care for Carr. The move itself posed no threat to Carr's well-being as evidenced by the fact that Carr has been moved to and from the hospital on several occasions since he entered the nursing home.

Daughter would not agree to move Carr to the nursing home in Lafayette with the attendant reduction in his code status. Therefore, the matter had to be litigated pursuant to the settlement agreement. On January 27, 1997, all disputed matters were tried to the court. The trial court approved the request to move Carr to the Lafayette nursing home, along with the attendant reduction in his code status. The trial court also granted the petition to remove Daughter as the guardian over the estate and appointed the Lafayette Bank and Trust Company as the successor guardian.

This appeal ensued. We granted Daughter's request that the trial court's order pertaining to Carr's move to Lafayette be stayed pending this appeal. Additional facts are supplied as necessary.

## DECISION

### I.

### *Procedural Defects*

Daughter alleges that the failure to adhere to certain procedural requirements prescribed by the Health Care Consent Act [HCCA] have resulted in reversible error. Specifically, Daughter argues that 1) Uncle had never filed a petition specifically requesting the trial court to make a health care decision, 2) Uncle had not requested the trial court to appoint a representative to act for Carr, and 3) Uncle had failed to provide notice to the Indianapolis nursing home under I.C. 16–36–1–8(b)(2) & (3) which provides that notice be provided to "anyone having the care and custody" of an incapacitated person. Daughter also argues Uncle's petition for her removal as guardian over Carr's estate was deficient. We disagree.

A party cannot argue an issue on appeal which was not properly presented to the trial court. *Blairex Laboratories, Inc. v. Clobes*, 599 N.E.2d 233, 237 (Ind.Ct.App. 1992), *trans. denied.* Error resulting from technical noncompliance with notice requirements is waived where the complaining party had actual notice and participated in the proceedings. *City of New Haven v. Indiana Suburban Sewers, Inc.*, 257 Ind. 609, 277 N.E.2d 361, 362 (1972). Matters not pleaded, but actually litigated are deemed to have been tried by the consent of the parties. *Family & Social Services v. Community Care*, 641 N.E.2d 1012, 1015 n. 3 (Ind.Ct.App. 1994). Additionally, reversal may not be predicated upon error invited by the parties.

*Stolberg v. Stolberg,* 538 N.E.2d 1, 5 (Ind.Ct. App.1989).

■ In the present case, the parties entered into a settlement agreement which expressly provided that they would serve as co-guardians over Carr's person and that any disagreements regarding changes in Carr's code designation or treating facility would be submitted to the court for resolution "in the best interests of [Carr], with no presumption of correctness in favor of either [Daughter or Uncle]." The litigation proceeded to trial on all matters disputed by the parties. Daughter has been continuously well-represented by a panel of attorneys and had never raised an objection to the procedures employed until after judgment was entered against her. The trial court in fact did appoint a GAL to represent Carr's interests. Finally, the Director of Operations of the Indianapolis nursing home testified at the trial on Daughter's behalf.

Under the circumstances, any procedural deficiencies have been invited or waived. Therefore, we find no reversible error.

## II.

### *Health Care Consent Act*

Daughter argues that, under the HCCA, she, as Carr's daughter, has priority over Uncle to make health care decisions for Carr. *See* I.C. 16–36–1–5(a)(2) (Consent to health care may be given by an adult child). Therefore, Daughter argues, in the event that an agreement over Carr's care could not be reached, the HCCA provides Daughter with the authority to make health care decisions.

■ The authority of an adult child to make health care decisions for an incapacitated person is not triggered if the incompetent person has a judicially appointed guardian. I.C. 16–36–1–5(a)(2)(A); 16–36–1–5(a)(1); *Matter of Lawrance,* 579 N.E.2d 32, 41 (Ind. 1991) (That no guardian has been appointed for the incompetent person is one condition which must be met before a parent or adult child is authorized to make a health care decision under the HCCA). Obviously, Daughter and Uncle, as Carr's co-guardians were authorized under the HCCA to make

health care decisions for Carr. I.C. 16–36–1–5(a)(1). Again, any error has been invited by the parties' settlement agreement which provided that any disagreements between the co-guardians would be resolved by the trial court. *See Stolberg,* 538 N.E.2d at 5.

Daughter argues that the decision to lower Carr's code status from A to C was one which affected his fundamental right to life. Therefore, Daughter argues that Uncle was required to prove that the reduction in Carr's code status served Carr's best interests by clear and convincing evidence. Daughter argues the evidence was insufficient to sustain the trial court's judgment under this rigorous standard.

We need not decide whether Uncle was required to prove his case by clear and convincing evidence. Regardless of the evidentiary standard to be employed, the evidence is sufficient to support the trial court's determination that the move to Lafayette, with the attendant reduction in code status, was in Carr's best interests.

■ The standard of appellate review for sufficiency of the evidence with respect to a judgment requiring proof by clear and convincing evidence imposes neither greater nor lesser judicial scrutiny than other sufficiency questions. *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137 (Ind.1988). Such judgments will be affirmed if, considering only the probative evidence and the reasonable inferences supporting it and without reweighing evidence or assessing witness credibility, a reasonable trier of fact could find the matter proven by clear and convincing evidence. *Id.*

■ The evidence, as set out in the FACTS section, supports the trial court's conclusion clearly and convincingly that Carr's best interests are served by a move to Lafayette (with the attendant reduction in code status) where his friends and family can more easily visit him and monitor his nursing home care. Therefore, we find no error.

## III.

### *Removal of Daughter as Guardian Over the Estate*

Daughter argues the trial court abused its discretion in removing her as the guardian

over Carr's estate. Daughter contends that the failure to provide Uncle with monthly reports as required under the settlement agreement was Key Bank's fault, and not her own. Daughter argues further that her failure to file the accounting within two years and thirty days of her appointment as required by I.C. 29–3–9–6(a) constituted merely "technical" noncompliance and, as such, was insufficient to justify her removal.

 The probate court may remove a guardian who has failed to perform a duty imposed by law or lawful order of the court or has otherwise proven unsuitable of discharging her responsibilities. I.C. 29–3–12–4(a); I.C. 29–1–10–6. The statute governing the proceedings for the removal of a guardian vests broad discretion in the trial court, and the appellate court will not interfere unless an abuse of discretion clearly appears. *Sibley v. Lewis,* 117 Ind.App. 655, 75 N.E.2d 420, 422 (1947).

 Daughter failed to file an accounting within the time period prescribed by statute. Also, the trial court could have concluded that Daughter's request to be compensated at the rate of $80.00 per hour for the ministerial services provided to the estate was unreasonable and detrimental to the estate. Therefore, we cannot conclude that the trial court abused discretion in removing Daughter as the guardian of Carr's estate.

### IV.

*Appointment of Lafayette Bank and Trust*

Daughter argues that the trial court abused discretion in appointing the Lafayette Bank and Trust Company in Lafayette, Indiana, as the successor guardian because there was no evidence submitted regarding this professional fiduciaries' relationship to Carr, or that Carr's best interests would be served by this appointment. Daughter urges the trial court's appointment of the Lafayette Bank is an abuse of discretion because Key Bank has been providing services to the estate and is willing to serve as guardian.

 Lafayette Bank's relationship with Carr is manifest upon the record; it is located in the same city where Carr will be re-

siding. Daughter's argument that Carr's interests are better served by Key Bank is undermined by her argument under Issue III in which she blamed Key Bank for failing to submit the monthly reports to Uncle as required under the Settlement Agreement.

All findings and orders of the trial court in guardianship proceedings are matters within the trial court's discretion. I.C. 29–3–2–4; *In re Guardianship of V.S.D.,* 660 N.E.2d 1064, 1066 (Ind.Ct.App.1996). Upon removal of a guardian, and when the appointment of a successor guardian is necessary, the Court "*shall* appoint a qualified guardian to succeed to the title, powers, and duties of the predecessor guardian." I.C. 29–3–12–4 (Emphasis added).

The trial court was required by statute to appoint a successor guardian. Under the circumstances, we cannot conclude that the trial court's appointment of a professional fiduciary in the city in which Carr will be residing was an abuse of discretion. Therefore, we find no error.

Judgment affirmed. Our stay order is lifted effective immediately.

BAKER and STATON, JJ., concur.