In re the Matter of the
**GUARDIANSHIP OF
L.L. and J.L.**

**Trudy (Littrell) Froelich, Appellant–
Natural Mother,**

v.

**Wilma Clark, Appellee–Guardian.**

No. 40A01–0008–CV–253.

Court of Appeals of Indiana.

Feb. 21, 2001.

Transfer Denied June 20, 2001.

Richard S. Eynon, Eynon, Harmon, Rocker & Glover, P.C., Columbus, IN, Attorney for Appellant.

Michael L. Rogers, Rogers & Dove, North Vernon, IN, Attorney for Appellee.

## OPINION

BARNES, Judge

### Case Summary

Trudy Froelich, the mother of nine-year-old L.L., appeals the trial court's denial of her petition to terminate Wilma Clark's guardianship of L.L., her paternal grandchild. We reverse and remand.

### Issue

We restate the sole issue presented as whether the findings entered by the trial court support its decision to deny Trudy's petition to terminate guardianship.

### Facts

Trudy filed a petition to terminate Wilma's guardianship of L.L. in September 1998. The trial conducted a hearing on May 23, 2000, and entered the following findings on June 19, 2000. These findings adequately set forth additional facts of the case:

1.) In the fall of 1992, Jerry Littrell, Wilma's son and Trudy were married and had returned from Florida to Jennings County with their two (2) sons, [J.L.], born January 1, 1989 and [L.L.], born February 8, 1992.

2.) Shortly after returning to Jennings County, in 1992, the two (2) young boys were left in Wilma's care, primarily due to Jerry and Trudy's tumultuous lifestyle including substance and alcohol abuse. Wilma was appointed temporary guardian of both her grandsons on August 10, 1992. On October 13, 1992, Wilma was appointed permanent guardian, apparently after an evidentiary hearing where both Wilma and Trudy were represented by counsel.

3.) On October 8, 1993 and May 4, 1994, Trudy attempted to dissolve the guardianship of the boys, but after hearing, failed. However, on November 7, 1994, [J.L.] only was returned to her care and has been with Trudy since. [L.L.] re-

mains under the guardianship of Wilma. Again on May 5, 1995, Trudy tried to dissolve the guardianship concerning [L.L.], and again lost her bid.

5.)[sic] [L.L.] is now eight (8) years of age and a third grader at Graham Creek Elementary School in Jennings County. He is an A/B student. He lives with Wilma and Wilma's daughter, Patty, in a farmhouse near Commiskey, Indiana. Wilma is divorced, but she is employed and works 8:30 a.m. to 4:30 p.m. She is sixty (60) years of age.

6.) Trudy, now age thirty-one (31), remarried to Matt Froelich in November of 1998. [J.L.] lives with them in Bartholomew County. Trudy works at Muscatatuck State Developmental Center earning Eleven Dollars and Sixty-eight Cents ($11.68) per hour. She works 6:30 a.m. to 2:45 p.m., 37.5 hours per week. Matt is a construction manager earning around Seventy-five Thousand Dollars ($75,000.00) per year. Matt appears to be a successful gentleman genuinely concerned and involved, not only with his own children, but also [J.L.] and [L.L.]. Matt, Trudy and [J.L.] live in a very nice country home with plenty of play space and good neighbors with young children.

7.) Jerry Littrell, [J.L.] and [L.L.]'s father, sees them on rare occasions and is virtually a nonexistent part of their lives.

8.) Wilma sees [J.L.] fairly regularly, and Trudy does likewise with [L.L.], although it isn't clear exactly how often these young brothers spend time together. They do get along well when together.

9.) It is undisputed that Wilma is very emotionally attached to [L.L.] and he to her.

10.) It is further undisputed that Trudy has been successful in rearing [J.L.]. He

is an articulate young man and a good student.

11.) [L.L.] used a bottle at bedtime until age four (4). As late as December, 1999, he slept in the same bed as Wilma. Wilma explains this was due to her concern for his health, primarily respiratory problems.

12.) Trudy currently takes Prozac for depression.

13.) Mike Morgan, Bill Howard and Ron and Kim Puckett, all professed their belief Matt Froelich and Trudy were good parents, good workers, and had no reservation recommending that [L.L.] live with Trudy.

14.) Bill Flowers, Ruby Miller, and Albert Sparkman all similarly testified about their favorable observations of Wilma and [L.L.] together and opined [L.L.] was fine living with Wilma.

15.) A custody evaluation performed by Dianne Farrar in the fall of 1999 recommends [L.L.] remain with Wilma, but also recommends significantly more time be spent by [L.L.] with Trudy as [L.L.] gets older.

16.) Trudy has remained drug and alcohol free for around six (6) years and attends Alcoholics Anonymous.

17.) [L.L.] is not involved in organized athletics or Scouting.

18.) Wilma and Trudy appear to have a good relationship with one another but for this ongoing dispute regarding [L.L.].

Record pp. 56–58.

Based on these findings, the trial court denied Trudy's petition to terminate guardianship as to L.L. It did, however, terminate the guardianship of J.L., which had never previously been officially terminated. Trudy has now appealed; Wilma does not appeal the termination of J.L.'s guardianship.

### Analysis

We have been asked to resolve a case involving the tension between the rights of a natural parent to raise her child, the "best interests" of that child, and the interests of a third party who has cared for and who desires to continue caring for the child. Trudy requested that the trial court enter findings and conclusions pursuant to Indiana Trial Rule 52, so we employ a two-tiered standard of review. We first determine whether the evidence supports the findings, and then we consider whether the findings support the judgment. *In re Paternity of J.A.C.*, 734 N.E.2d 1057, 1059 (Ind.Ct.App.2000). The trial court's findings and judgment will not be set aside unless they are clearly erroneous. *Id.* A judgment is clearly erroneous when it is unsupported by the conclusions drawn, and conclusions are clearly erroneous when they are unsupported by findings of fact. *Id.* Trudy does not allege that the findings entered by the trial court are unsupported by the evidence, but claims that those findings do not support the denial of her petition to terminate guardianship.

Initially, we observe that the termination of guardianship statute simply provides that termination may occur whenever it is no longer necessary for any reason. Ind.Code § 29-3-12-1(c)(4). Strictly applying this statute, it is undisputed that the original grounds for granting Wilma guardianship over L.L.—i.e., because Trudy and her ex-husband were drug and alcohol abusers and fought regularly—were no longer present when Trudy filed the current petition to terminate guardianship. However, our review of the case law in this area indicates that we generally have applied a more detailed test than might arguably be required by the plain language of the statute—whether the original grounds for granting the guardianship still exist—to determine whether a third party guardianship of a child should be terminated. This appears to be based on the concern that a guardianship proceeding in such circumstances is, in essence, a child custody proceeding that raises important concerns about parental rights and the "best interests" of children.

At the outset we acknowledge that the opinions rendered by this court in the area of natural parent-third party custody disputes over the past three decades, whether those disputes have arisen out of guardianship proceedings or other custody proceedings, have not been entirely consistent. It is well established that when a parent initiates an action to obtain custody, a nonparent seeking to retain custody must bear the burden of overcoming the parent's presumptively superior right to custody. *Hunt v. Whalen*, 565 N.E.2d 1109, 1110–11 (Ind.Ct.App.1991). How this presumption is rebutted, however, has been subject to differing interpretations. The starting point in our analysis is *Hendrickson v. Binkley*, 161 Ind.App. 388, 316 N.E.2d 376 (1974), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975), in which we set forth the following three-part test for analyzing such disputes:

> First, it is presumed it will be in the best interests of the child to be placed in the custody of the natural parent. Secondly, to rebut this presumption it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. The third step is that upon a showing of one of these above three factors, then it will be in the best interests of the child to be placed with the third party.

*Id.* at 393–94, 316 N.E.2d at 380. Furthermore, we held that evidence to rebut the presumption in favor of custody in the natural parent had to be "clear and cogent." *Id.* at 395–96, 316 N.E.2d at 381.

Another panel of this court expressly rejected this allegedly "mechanical approach" to resolving natural parent-third party custody disputes in *Turpen v. Turpen*, 537 N.E.2d 537, 539–40 n. 2 (Ind.Ct. App.1989). The *Turpen* court held that "the question before us then is whether there is *any evidence* in favor of the trial court's determination that the presumption the interest of the child would best be served by placing him in the custody of the natural [parent] had been sufficiently rebutted by the evidence." *Id.* at 539 (emphasis added). *Turpen* also failed to mention the *Hendrickson* court's requirement that the parental preference presumption could only be rebutted by "clear and cogent" evidence.

Cases following *Turpen* have split on the extent to which it has been followed. Some have continued to adhere strictly to the *Hendrickson* "mechanical approach." *See Matter of Guardianship of R.B.*, 619 N.E.2d 952, 954 (Ind.Ct.App.1993). Others have wholeheartedly adopted *Turpen*'s holding. *See In re Paternity of L.K.T.*, 665 N.E.2d 910, 912 (Ind.Ct.App.1996). Between the thoughts articulated in these opinions are cases that acknowledge the three factors for rebutting the presumption in favor of the natural parent specified in *Hendrickson*, but recognize that other, nonspecific factors might exist in a particular case that would warrant rebutting that presumption. *See, e.g., In re Marriage of Huber*, 723 N.E.2d 973, 976 (Ind.Ct.App. 2000). Nevertheless, even when a case is analyzed using the "any evidence" test, we have held that a generalized finding that a child's placement with a third party as opposed to a natural parent is in his or her "best interests" is insufficient to rebut the parental preference presumption. *Id.*

Additionally, we have noticed that some cases purporting to rely on *Hendrickson* to various degrees have altered a portion of its holding. As evidenced by the above quote, *Hendrickson requires* that a child be placed in the custody of the third party if the presumption in favor of the natural parent(s) is rebutted. However, *Huber* and *Guardianship of R.B.* both indicate that if the presumption in favor of the parent(s) is rebutted, "then the question becomes whether it is in the best interests of the child to be placed in the custody of the third party." *Huber*, 723 N.E.2d at 975; *Guardianship of R.B.*, 619 N.E.2d at 954. Under these cases, therefore, a third party does not automatically gain custody upon rebuttal of the presumption, but a separate "best interests" analysis then ensues.

We believe the approach of these later cases is the sounder one. We can conceive of cases where, for example, the presumption in favor of the parent has been rebutted because of his or her long acquiescence, but evidence at the time of the custody hearing indicates that the third party would not be an effective parental figure or other "best interest" factors would indicate custody should be with the natural parent.

■ Although not raised by either party at the appellate level, we cannot ignore the constitutional implications of this case. As the United States Supreme Court has recently reiterated, the Fourteenth Amendment's Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147

L.Ed.2d 49 (2000).[1] Moreover, the Court said

> there is a presumption that fit parents act in the best interests of their children.... [S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Id.* at 2061. Thus, the preference in favor of a parent having custody of his or her children, where the parent has not been shown to be unfit, is rooted in the United States Constitution.

 Further adding to the potential confusion surrounding natural parent-third party custody disputes, our legislature amended the statutes governing certain custody proceedings in 1999 to provide that "de facto" custodians could be parties to such proceedings, in addition to the natural parents. A "de facto custodian" is defined as:

> [A] person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least:
>
> > (1) six (6) months if the child is less than three (3) years of age; or
> >
> > (2) one (1) year if the child is at least three (3) years of age.
>
> Any period after a child custody proceeding has been commenced may not be included in determining whether the child has resided with the person for the required minimum period....

Ind.Code § 31–9–2–35.5. A "de facto custodian" must be made a party to a custody proceeding following a paternity determination, pursuant to Indiana Code Section 31–14–13–2.5(c), or in a marital dissolution action, pursuant to Indiana Code Section 31–17–2–8.5(c). Once a court determines a "de facto custodian" exists and that individual has been made a party to a custody proceeding, the court shall consider the following factors in determining the child's "best interests," in addition to the usual "best interests" of the child factors contained in Indiana Code Sections 31–14–13–2 and 31–17–2–8:

> (1) The wishes of the child's de facto custodian.
>
> (2) The extent to which the child has been cared for, nurtured, and supported by the de facto custodian.
>
> (3) The intent of the child's parent in placing the child with the de facto custodian.
>
> (4) The circumstances under which the child was allowed to remain in the custody of the de facto custodian, including whether the child was placed with the de facto custodian to allow the parent seeking custody to:
>
> > (A) seek employment;
> >
> > (B) work; or
> >
> > (C) attend school.

Ind.Code §§ 31–14–13–2.5(b) and 31–17–2–8.5(b). Finally, "[t]he court shall award custody of the child to the child's de facto custodian if the court determines that it is in the best interests of the child." Ind. Code §§ 31–14–13–2.5(d) and 31–17–2–8.5(d).

 Although Wilma does not clearly state so on appeal, at the trial court and now by implication she claims that these statutory amendments removed any pre-

---

1. *Troxel* specifically addressed the constitutionality of a Washington statute governing third party visitation. As such, we do not cite *Troxel* as directly controlling in the present case but merely note its general statements indicating the favor that natural parents enjoy under the United States Constitution.

sumption favoring the natural parent in a third party child custody dispute. To consider this contention, we reiterate some basic principles of statutory interpretation:

It is a rule of statutory construction that the legislature did not intend by statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication. We must presume that the legislature is aware of the common law, and a statute will not be construed as changing the common law farther than the import of its words. An abrogation of the common law will be implied (1) where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law; or, (2) where the two laws are so repugnant that both in reason may not stand.

We presume that the General Assembly intended its language to be applied in a logical manner consistent with the statute's underlying policies and goals. We also presume that the legislature would not intend an unreasonable or absurd result. However, we cannot and do not engage in statutory interpretation unless the statutory language is ambiguous, or susceptible to more than one interpretation. If the statute in question is not ambiguous, we must give effect to the plain, ordinary, and usual meaning of the words of the statute.

*Foster v. Evergreen Healthcare, Inc.*, 716 N.E.2d 19, 25–26 (Ind.Ct.App.1999) (internal citations omitted), *trans. denied.* We do not believe the General Assembly intended in all cases to remove the presumption in favor of parents obtaining or retaining custody of their children through these "de facto custodian" statutory amendments.

First, if the legislature had desired to abrogate a long-standing feature of our common law, and one arguably required by the United States Constitution, by removing the parental preference presumption in certain custody proceedings, it would have done so explicitly by clearly providing language to that effect. Second, the amended code sections refer to the general "best interests" test to be applied in certain custody proceedings. This is a separate analysis in custody proceedings involving a third party that is reached only after the presumption in favor of the parent has been rebutted. We believe the intent of the "de facto custodian" amendments is to clarify that a third party may have standing in certain custody proceedings, and that it may be in a child's best interests to be placed in that party's custody. We do not believe there was an intent to displace the parental preference presumption. Although the underlying cause in this particular case was a proceeding to terminate a guardianship and not an action brought under the child custody statutes to which the "de facto custodian" amendments apply, Indiana Code Chapters 31–14–13 and 31–17–2, the reasoning remains constant and the same in any situation. The presumption in favor of natural parents prevails.

After considering the relevant case law, the "de facto custodian" statutory amendments, and constitutional concerns, we hold that the following is the appropriate standard for courts to apply when considering a natural parent-third party child custody dispute. First, there is a presumption in all cases that the natural parent should have custody of his or her child. The third party bears the burden of overcoming this presumption by clear and cogent evidence. Evidence sufficient to rebut the presumption may, but need not necessarily, consist of the parent's present unfitness, or past abandonment of the child such that the affections of the child and

third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. However, a general finding that it would be in the child's "best interest" to be placed in the third party's custody is not sufficient to rebut the presumption. If the presumption is rebutted, then the court engages in a general "best interests" analysis. The court may, but is not required to, be guided by the "best interests" factors listed in Indiana Code Sections 31–14–13–2, 31–14–13–2.5, 31–17–2–8, and 31–17–2–8.5, if the proceeding is not one explicitly governed by those sections.

█ If a decision to leave or place custody of a child in a third party, rather than a parent, is to be based solely upon the child's "best interests," as opposed to a finding of parental unfitness, abandonment, or other wrongdoing, such interests should be specifically delineated, as well as be compelling and in the *"real and permanent"* interests of the child. *Turpen,* 537 N.E.2d at 538 (emphasis added). As we have previously observed,

> 'If the "best interest rule" was the only standard needed without anything else, to deprive the natural parent of custody of his own child, then what is to keep the government or third parties from passing judgment with little, if any, care for the rights of natural parents. In other words, a child might be taken away from the natural parents and given to a third party simply by showing that a third party could provide the better things in life for the child and therefore the "best interest" of the child would be satisfied by being placed with a third party.'

*Huber,* 723 N.E.2d at 976 (quoting *Hendrickson,* 161 Ind.App. at 396, 316 N.E.2d at 381). This observation is entirely consistent with the views of the Supreme Court, which has stated that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel,* 530 U.S. 57, 120 S.Ct. at 2064.

█ Applying this standard to the present case, we cannot conclude that the findings support the judgment to deny Trudy's petition to terminate Wilma's guardianship because they were insufficient to rebut the presumption in favor of Trudy's obtaining custody of L.L. First, there is absolutely no indication that Trudy is presently an unfit parent. Although she had difficulties with substance abuse in the past, the trial court found that she has been sober for six years. Additionally, it was, in the trial court's words, "undisputed" that Trudy had been successful in raising J.L. during the previous six years. Trudy's second husband, Matt, was found to "be a successful gentleman genuinely concerned and involved … with … [J.L.] and [L.L.]." Record p. 57. Four persons professed their belief that Matt and Trudy were good parents; no one, not even the custody evaluator who recommended that L.L. remain with Wilma, denied these assertions. It was Wilma's burden to prove Trudy's unfitness at the present time, not at some time in the past.[2] *See Hendrickson,* 161 Ind.App. at 394, 316 N.E.2d at 380.

█ Additionally, there is no finding that Trudy voluntarily abandoned L.L. for any considerable length of time. It is unclear from the trial court's findings whether Trudy initially consented to plac-

---

**2.** The relevance of the trial court's finding number twelve, that Trudy currently takes Prozac, is not entirely clear. We assume this is a positive comment upon Trudy, reflecting that she is responsibly treating an illness.

ing him in Wilma's custody.[3] In any event, beginning less than one year after the permanent guardianship was granted, Trudy sought to terminate the guardianship four separate times in five years. Thus, she did not acquiesce in Wilma's continued guardianship.[4] Furthermore, as the trial court found, Trudy has continued to visit L.L. regularly during the course of the guardianship and has thus made an effort to remain an important part of his life, even though she did not have custody of him.

The only finding that conceivably supports the trial court's decision to deny Trudy's petition to terminate guardianship is that "[a] custody evaluation performed by Dianne Farrar in the fall of 1999 recommends [L.L.] remain with Wilma...." Record p. 58. This finding by itself was insufficient to rebut the presumption in favor of Trudy. We do not deny that custody evaluations may be a useful tool in resolving parent-third party child custody disputes. However, it must be remembered that such evaluations are most commonly performed to help courts resolve custody disputes involving two natural parents following a divorce or paternity determination, where there is clearly no presumption favoring either party. By contrast, where there is a presumption favoring a natural parent over a third party, a custody evaluation performed in such a situation without consideration of that presumption should be looked at differently, with less deference given to an ultimate custody recommendation than might be given in a custody dispute involving two natural parents with equal, but competing, rights.[5] Here, the custody evaluator expressly testified that the evaluation was performed without there being any initial preference in favor of Trudy.

In such a case, a court should look beyond the evaluator's ultimate custody recommendation and examine whether the evaluator's report and/or accompanying testimony contains evidence of parental unfitness, abandonment, or other wrongdoing, or of compelling, real, and permanent interests of the child that require his or her custody with a third party. The evaluator's report and testimony in the present case contained no such evidence. The report speaks of Trudy and Matt Froelich and their parenting capabilities only in positive terms. The evaluator also expressly testified that she believed Trudy was capable of taking care of both J.L. and L.L. Finally, the report stated that while L.L. was happy living with Wilma, he also expressed "how much he enjoys being with [J.L.], his mother, and his stepfather." Record p. 168. The evaluator's ultimate recommendation that L.L. remain with Wilma for the present was based on her concern that L.L.'s separation from her could "in the short term, have a negative effect on him" because of his emotional attachment to her. Record p. 149. However, the custody evaluator also agreed that many children of divorce likewise experience some form of separation anxiety, but that most of those children, when they receive counseling, do not experience per-

---

3. The custody evaluator's report indicates that Wilma filed a restraining order against Trudy in September 1992, the same month when the initial temporary guardianship petition was filed, perhaps indicating that the legal transfer of the guardianship of L.L. might have been less than voluntary.

4. We reject Wilma's claim that by not appealing the denial of her first three petitions to terminate guardianship, Trudy acquiesced in Wilma's continued guardianship.

5. Even in such a situation, a trial court has the discretion to reject the opinions of experts regarding child custody. *Clark v. Madden,* 725 N.E.2d 100, 109 (Ind.Ct.App.2000).

manent negative effects. Record p. 154–55. Thus, this evaluator's custody recommendation was based on concern over a possible short-term negative impact on L.L. that could be alleviated by counseling, not on L.L.'s permanent best interests. In fact, the evaluator testified that she believed, due to Wilma's age, that custody of L.L. would eventually be transferred to Trudy at some unspecified point in the future.

We do not wish to minimize the fact that Wilma and L.L. love each other, and that L.L. expressed his wish to remain with Wilma. Clearly, it is desirable that a child develop a positive emotional bond with his or her primary caregiver. Additionally, we recognize the upheaval that a change in custody will undoubtedly cause. Such upheavals, however, are an unfortunate consequence of every situation in which a court must enter an order that changes a child's custody. Such an upheaval, where it can only be said to have potential short-term effects, is insufficient to deny a natural parent custody of his or her child. We must conclude that the trial court's judgment was clearly erroneous in this case, in that the findings were insufficient to rebut the presumption that Trudy, as a natural parent, should obtain custody of her child, L.L.

## Conclusion

The trial court's findings do not reveal the existence of any unfitness or long-term voluntary abandonment or relinquishment of L.L. on the part of Trudy; nor do they reveal the existence of any compelling, real, and permanent interests of L.L. that would be best served by his remaining in the custody of Wilma. Therefore, the presumption in favor of Trudy's obtaining custody of L.L. was not rebutted. Finally, we believe that affirming the trial court's decision to permit Wilma to retain custody of

L.L. could have potentially adverse public policy consequences. For the sake of children, society should encourage parents who are experiencing difficulties raising them to take advantage of an available "safety net," such as a grandparent who is willing to accept temporary custody of a child. It would discourage such action by parents in difficult straits and discourage efforts to "reform" or better their life situation if their chances of later reuniting with their children were reduced. We reverse and remand with instructions to terminate the guardianship. On remand, the trial court may enter such orders as it deems necessary regarding counseling for the parties and other related matters, which we trust will be followed by the parties.

Reversed and remanded.

BAKER and BROOK, JJ., concur.