Krag ROYDES and Lindsay Cappy, Appellants–Petitioners,

v.

Barbara CAPPY, Appellee–Respondent.

No. 53A04–0105–CV–207.

Court of Appeals of Indiana.

Feb. 18, 2002.

---

---

Donna F. Pratt, Bloomington, IN, Attorney for Appellant.

Susan H. Nelson, Bloomington, IN, Attorney for Appellee.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellants-petitioners Krag Roydes ("Krag") and Lindsay Cappy ("Lindsay") appeal the trial court's denial of their petition to terminate guardianship and restore custody of minor child to mother with appropriate orders for father. We affirm in part and reverse in part.

### Issues

Krag and Lindsay raise two issues, which we restate as follows:

I. whether the trial court abused its discretion in denying their petition; and

II. whether the trial court erred in ordering Krag to pay $60 weekly to appellee-respondent Barbara Cappy ("Barbara") toward work-related child care expenses.

### Facts and Procedural History

On November 15, 2000, Lindsay and Krag filed a petition to terminate Barbara's guardianship of their minor child, T.C., and to restore custody to Lindsay with appropriate orders for Krag. On December 12, 2000, the trial court held an emergency hearing. On that date, Lindsay and Krag requested findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. On December 18, 2000, the trial court entered an order requiring Lindsay and Barbara, her mother, to follow a visitation schedule until further notice. On February 15, 2001, the trial court heard additional evidence on the petition and related issues.

On April 2, 2001, the trial court issued the following findings that set forth the relevant facts of the case:

1. [T.C.] was born out-of-wedlock on August 2, 1996 to Lindsay Paige Cappy (Lindsay) and Krag Roydes (Krag). On August 9, 1996, Krag's name was listed in the birth records of the State of Indiana as the father of [T.C.]

2. On August 16, 1996, Barbara Cappy (Barbara) filed a Petition for Appointment of Guardian over [T.C.] Attached to the Petition for Appointment of Guardian were consents signed by Lindsay and Krag. The Order Appointing Guardian was issued by this court on August 29, 1996.

3. Barbara is the mother of Lindsay and the maternal grandmother of [T.C.]. Barbara began living with her present husband, Frank [V]elasco, when Lindsay was nine years old. Barbara and Frank were married on February 29, 2000. Barbara and Frank have lived at the same address in Bloomington for the past 11 to 12 years.

4. Prior to the birth of [T.C.] and for a while during her pregnancy, Lindsay lived with Krag. Lindsay and Krag lived with Barbara and Frank for one month after [T.C.] was born. Then Lindsay, [T.C.], and Krag lived together in an apartment for almost one year. Around April 1997, Lindsay and [T.C.] moved into a home in the Winslow Farms de-

velopment in Bloomington, Indiana. The home was purchased by Barbara to provide decent housing for Lindsay and [T.C.] Barbara and Lindsay agreed that Barbara would be responsible for the mortgage payments if Lindsay would pay for the utilities, the association fees and the property taxes. Also, at some point during 1997, Barbara permitted Lindsay to use one of her automobiles. The automobile was titled to Barbara, and Barbara paid the automobile insurance.

5. Lindsay did not pay the utilities bills regularly nor did she pay the property taxes. The utilities were shut off on occasion because the bills were not paid. The house was frequently dirty with clothes and toys strewn about the floors. Frank, Barbara's husband, visited the home regularly and made all the repairs that were needed. Sometime during 2000, Barbara and Lindsay agreed that if Lindsay did not pay the property taxes that were due in Fall 2000, Barbara would take possession of the automobile that Lindsay was driving. Lindsay did not pay the property taxes, and Barbara took possession of the automobile.

6. Lindsay rented an apartment in Highland Park and moved out of the Winslow Farms house in either October or November 2000. The Winslow Farms house was left in a state of disrepair. The electric bill had not been paid by Lindsay. As a result, the pipes burst when the weather turned cold. Due to the condition of the house, it cannot be sold or rented until the repairs are made. Barbara is still obligated to make monthly mortgage payments in the amount of $618.00.

7. The automobile was returned to Lindsay after she moved out of the Winslow Farms addition. Barbara took possession of the automobile again one day after Lindsay filed the instant Petition to Terminate Guardianship. Lindsay filed a Motion for Emergency Hearing on November 21, 2000 alleging that an emergency existed because Barbara and Frank had prevented her from using the automobile and that they were attempting to prevent her from having meaningful access to [T.C.]

8. Lindsay has a sketchy work history. She was fired from her jobs with Baskin Robbins, Chris Harper, and the Indiana University Credit Union. She has been employed for approximately seven months for the Fishing Shedd.

9. Barbara is not presently employed. She worked at the Indiana University Golf Course for a number of years. Barbara earned $22,000.00 a year while she was employed at the golf course and spent most of it on [T.C.] and Lindsay. She sold some of her stock to pay for Lindsay and [T.C.]'s expenses. Frank is retired from Otis Elevator, and he is Barbara's only source of support. He gives Barbara $1,000.00 each month to pay for [T.C.]'s care and the mortgage payments on the Winslow Farms property. Barbara has received a negligible amount of money from Lindsay and Krag since she became [T.C.]'s guardian. In February 2000, Frank told Lindsay and Krag that he would receive an additional $1,000.00 in retirement benefits if he and Barbara could adopt [T.C.] Frank explained that the extra money that he would receive each month would ease the financial strain that he and Barbara were experiencing by supporting [T.C.] Lindsay and Krag refused.

10. Barbara has made the following financial contributions for the care and upkeep of Lindsay and [T.C.] since [T.C.]'s birth:

a. $426.77 in uninsured pre-natal and birth expenses not covered by Barbara's health insurance;

b. $7,380.65 for the purchase and maintenance of the automobile that Lindsay was using;

c. $365.00 in Association dues on the Winslow Farms property;

d. $3,232.22 in home furnishings for the Winslow Farms house;

e. $522.00 in homeowners insurance on the Winslow Farms house;

f. $362.11 in lawn care at the Winslow Farms address;

g. $248.79 in maintenance costs at the Winslow Farms address;

h. $21,137.12 in down payments, legal fees, and monthly mortgage payments on the Winslow Farms property;

i. $3,337.67 in property taxes at the Winslow Farms address;

j. $478.37 for utilities at the Winslow Farms address;

k. $2,461.63 for medical insurance, personal, and miscellaneous expenses for Lindsay; and

l. $19,550.71 for food, clothing, diapers, formula, day care, medical care, prescriptions, books, toys, and miscellaneous expenses for [T.C.]

11. In addition to the $39,952.33 spent on Lindsay and $19,550.71 spent for [T.C.]'s care, [T.C.] has lived with Barbara and Frank at least one-half of his life. In fact, the daycare attendance records reveal that beginning June 2000 up to and including December 8, 2000, Barbara or Frank dropped off [T.C.] at daycare 70 mornings and picked him up on 42 afternoons. During that same period, Lindsay dropped off [T.C.] 37 mornings and picked him up 42 afternoons. By way of explanation, [T.C.] would spend the night with the person who picked him up from daycare and that person would drop him off at daycare the following morning.

12. Lindsay was born on March 4, 1978. . . . She works 40 hours a week at the Fishing Shedd where she earns $7.25 an hour. Krag was born on March 4, 1977. . . . He is employed by Butler Toyota in Indianapolis and earns approximately $532.21 per week.

13. Krag began paying Lindsay $50.00 a week in child support after their separation. For the past year, he has paid Lindsay $70.00 a week in child support. Krag has never paid medical or child care expenses for [T.C.] He has neither paid nor offered to reimburse Barbara for birth or prenatal expenses. Krag can provide health insurance though his employment if the guardianship is terminated. Krag visits regularly with [T.C.] at his residence in Indianapolis.

14. Barbara's concerns about Lindsay's inability to care for [T.C.] are justified. Lindsay has a history of losing jobs and not paying bills. Lindsay has been physically violent toward Barbara in the past, and Krag reported that Lindsay was violent toward him in the presence of [T.C.] when he and Lindsay were living together.

15. [T.C.] is a healthy, well-adjusted boy. He attends a daycare center at Indiana University. Health insurance is provided by Frank through his previous employment.

16. The Petition to Terminate Guardianship is denied. According to Lindsay, the only reason for establishing the guardianship was to pay for the prenatal and birth expenses for [T.C.] If that were the case, the guardianship should have been terminated as soon as those expenses were paid. Barbara has been [T.C.]'s guardian since August 29, 1996. Lindsay's contributions to Bar-

bara for the care of her son, [T.C.], since August 29, 1996 total $1,117.92, and Krag has contributed only $200.00. Barbara has spent $59,503.04 for the care and expenses of Lindsay and [T.C.] all of which was derived from Barbara's employment, stock sales, and Frank's retirement income.

17. In addition to the financial contributions, [T.C.] has been in Barbara's physical custody for at least one-half of his young life. Lindsay and Krag accepted the financial contributions ungrudgingly and without an offer to reimburse Barbara and Frank for their support.

18. Lindsay should visit as set forth in the entry dated December 18, 2000. Lindsay should pick up [T.C.] from daycare on Monday and Wednesday evenings and return him to daycare the following mornings. Barbara should pick up [T.C.] from daycare on Tuesday and Thursday evenings and return him to daycare the following mornings. Lindsay and Barbara should alternate weekends. They should alternate holiday visitations with Lindsay visiting New Year's Day, Memorial Day, and Labor Day in the years ending in odd numbers; Easter, Fourth of July, and Thanksgiving in the even years. Every Christmas Eve and every Christmas Day 3:00 p.m. until December 27. In addition, Lindsay should have extended visitation each year during her summer vacation. Krag should visit with [T.C.] during the periods Lindsay is visiting with [T.C.] according to the times agreed upon by Lindsay and Krag. Krag should have extended visitation with [T.C.] each year during his summer vacation.

19. According to the Indiana Child Support Guidelines, Krag would pay $139.21 in child support if [T.C.] were in Lindsay's custody. Krag is currently paying $70.00 each week to Lindsay in child support. Based on the worksheet which is attached and marked Exhibit "A", Krag should pay an additional amount of $65.00 to Barbara which should be applied to [T.C.]'s daycare expenses.[1] On the attached worksheet, Krag would receive $15.47 for regular visitation. In arriving at the $65.00 that Krag should pay to Barbara, the court deviated from the credit that would be allowed for visitation because Krag will be sharing visitation periods with Lindsay and Barbara. Payments should be made directly to Barbara effective Friday, April 6, 2001 and a like amount each Friday thereafter until further order of the court.

Appellant's Appendix at 53–57. The trial court denied Lindsay and Krag's petition to terminate Barbara's guardianship and ordered Krag to "pay $60.00 each week toward the child care expenses, and the payments shall be made directly to Barbara." *Id.* at 59.

Lindsay and Krag now appeal.

### Discussion and Decision

### I. Denial of Petition to Terminate Guardianship

At Lindsay and Krag's request, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A).

As such, our standard of review is two-tiered. We first determine whether the evidence supports the findings, and then we consider whether the findings support the judgment. The trial court's

---

1. The judgment portion of the trial court's order requires Krag to pay $60.00 in weekly support to Barbara.

findings and judgment will not be set aside unless they are clearly erroneous. A judgment is clearly erroneous when it is unsupported by the conclusions drawn, and conclusions are clearly erroneous when they are unsupported by findings of fact.

*In re Paternity of J.A.C.*, 734 N.E.2d 1057, 1059 (Ind.Ct.App.2000) (citations omitted). "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there will be a basis for reversal." *Harris v. Smith*, 752 N.E.2d 1283, 1290–91 (Ind.Ct.App.2001) (quoting *Turpen v. Turpen*, 537 N.E.2d 537, 539 (Ind.Ct.App.1989)) (alteration in *Harris* ).

■ Originally, Barbara was granted guardianship of T.C. for health insurance purposes. Under Indiana Code Section 29–3–12–1(c)(4), a court may terminate a guardianship whenever it is no longer necessary. If we strictly apply this statute, the original reason for granting Barbara guardianship of T.C. no longer existed when Lindsay and Krag filed their termination petition. As stated in the findings, Krag can provide insurance for T.C. through his employer-sponsored medical insurance program.[2]

■ In determining whether a guardianship should be terminated, however, we have generally applied a more detailed test than required by the plain language of the statute. *Froelich v. Clark*, 745 N.E.2d 222, 227 (Ind.Ct.App.2001), *trans. denied.*

We look beyond whether the original grounds for granting the guardianship still exist. *Id.* This is based on the concern that a guardianship proceeding in such circumstances is, in essence, a child custody proceeding that raises important concerns about parental rights and the "best interests" of the child. *Id.*

In *Froelich,* we evaluated relevant case law, statutory amendments, and constitutional concerns and held that courts must apply the following standard when considering a parent/non-parent child custody dispute:

First, there is a presumption in all cases that the natural parent should have custody of his or her child. The third party bears the burden of overcoming this presumption by clear and cogent evidence. Evidence sufficient to rebut the presumption may, but need not necessarily, consist of the parent's present unfitness, or past abandonment of the child such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. However, a general finding that it would be in the child's "best interest" to be placed in the third party's custody is not sufficient to rebut the presumption. If the presumption is rebutted, then the court engages in a general "best interests" analysis. The court may, but is not required to, be guided by the "best interests" factors listed in Indiana Code Sections 31–14–

---

**2.** Barbara claims that the original reason for granting the guardianship remains intact because Krag never initiated a paternity action to have T.C. legally established as his dependent child. She further claims that Krag has never initiated legal proceedings for support or visitation. We point out, however, that Lindsay and Krag filed a petition to terminate guardianship and restore custody of minor child to mother with appropriate orders for

father. Although Krag did not request that paternity be established, he did state in the petition that he "is gainfully employed on a full time basis and is able to provide for [T.C.]" and that he "believes it to be in [T.C.]'s best interest that custody be with Lindsay with visitation to be with Krag." Appellant's Appendix at 6. We therefore conclude that by joining in the petition, Krag sought to claim T.C. as a dependent.

13–2, 31–14–13–2.5, 31–17–2–8, and 31–17–2–8.5, if the proceeding is not one explicitly governed by those sections.

If a decision to leave or place custody of a child in a third party, rather than a parent, is to be based solely upon the child's "best interests," as opposed to a finding of parental unfitness, abandonment, or other wrongdoing, such interests should be specifically delineated, as well as be compelling and in the "real and permanent" interests of the child.

*Id.* at 230–31. (citation omitted).

In reviewing the facts of the instant case under this standard, we conclude that the trial court did not abuse its discretion in denying Lindsay and Krag's petition to terminate Barbara's guardianship. Although the trial court did not specifically find that Lindsay was presently an unfit parent, it did find that "Barbara's concerns about Lindsay's inability to care for [T.C.] are justified." The trial court further found that Lindsay "has a history of losing jobs and not paying bills," that she had been "physically violent toward Barbara in the past," and that "Krag reported that Lindsay was violent toward him in the presence of [T.C.] when he and Lindsay were living together." Although these past occurrences are not necessarily indicative of Lindsay's present parental fitness, the record contains sufficient evidence to support the trial court's finding that Lindsay is unable to care for T.C.

Lindsay's current job at the Fishing Shedd may pay more than minimum wage, but the record indicates that her income is insufficient to support both her and T.C. Lindsay testified that her net income from her current job is "a little more" than $200 per week and that she receives $70 per week in support from Krag, for a total net income of approximately $1080 per month. At the time of the hearing, Lindsay's monthly expenses included $522 in rent, $69 for automobile and renter's insurance, $50 for natural gas, $20 for water and sewage, $70 for electricity, $12 for cable, $60 to $80 for food, $25 to $30 for a minimum payment on her credit card balance,[3] $12 for telephone, and $30 to $38 for gasoline, for a total of approximately $983. *See* Transcript at 204–09, 219. Lindsay further testified that she would pay T.C.'s childcare expenses upon termination of the guardianship, at a subsidized cost of $27 per week, or $108 per month. *See id.* at 208–09. Thus, absent clothing and other incidentals, emergencies, and necessities such as car payments, maintenance, and repair,[4] Lindsay's monthly expenses total approximately $1011, or a scant $69 less than her current net income.

In determining whether a parent is presently fit to regain custody of a child, we may not turn a blind eye to that parent's very recent history of financial irresponsibility and employment instability, especially if it is consistent with an established pattern of such behavior. Lindsay's failure to pay utility bills at the Winslow Farms house as recently as November of 2000 resulted in the electricity being shut off during cold weather, and her failure to pay the property taxes resulted in Barbara repossessing her automobile. More importantly, Lindsay has yet to demonstrate that she can meet her own financial needs for any significant period of time, let alone

---

**3.** Lindsay testified that she did not know the amount of her outstanding credit card balance.

**4.** After Barbara repossessed the automobile she had given Lindsay, Sharon Roydes ("Sharon"), Krag's mother, gave Lindsay a 1989 Camry. At the hearing, Lindsay admitted that she "ha[d]n't really set ... up" a payment schedule with Sharon and that she could not afford to buy a car if Sharon repossessed the Camry for any reason.

the additional needs of her five-year-old son.

Although it is certainly laudable that Lindsay has remained gainfully employed for several months and that her employer considers her to be a good employee, this evidence alone is insufficient to overcome Barbara's clear and cogent showing that Lindsay is presently an unfit parent. In *Froelich*, we stated that "society should encourage parents who are experiencing difficulties raising them to take advantage of an available 'safety net,' such as a grandparent who is willing to accept temporary custody of a child." 745 N.E.2d at 233. At the hearing, however, Lindsay asserted that she was sufficiently responsible to resume her parenting duties without relying on Barbara's safety net: "Because [Krag and I] have been, we have been for a while now. We both have jobs. We are making money. I've got this house now that has no connections with my mom. I don't, I don't want anything from her anymore. She, we've been doing it. We are [T.C.'s] parents." Transcript at 201.

■ As the evidence clearly demonstrates, however, Lindsay was unable to maintain her former residence and automobile even with her mother's assistance, and her current income is insufficient to meet the financial needs of both her and her son even with Krag's and Sharon's assistance.[5] When viewed in conjunction with her "sketchy work history," this evidence is sufficient to support the trial court's finding that Lindsay is unable to care for T.C. We therefore affirm that part of the trial court's judgment denying Lindsay and Krag's petition to terminate Barbara's guardianship.[6]

## II. Child Care Expenses

■ Lindsay and Krag contend that the trial court erred in ordering Krag to pay Barbara $60 weekly toward work-related child care expenses.[7] Mindful that we are reviewing the trial court's order in a guardianship context, we adhere to the following standard of review:

> A trial court's calculation of a child support obligation under the child support guidelines is presumptively valid. Reversal of a trial court's child support order is merited only where the determination is clearly against the logic and effect of the facts and circumstances. On appellate review of a child support order, weight and credibility issues are disregarded and only the evidence and reasonable inferences favorable to the judgment are considered.

5. We further observe that Krag is currently under no legal obligation to provide health insurance for T.C. At the hearing, Lindsay testified that her current employer did not offer health insurance benefits and acknowledged that she would have to seek "assistance from Hoosier Healthwise" to provide such benefits for T.C. Transcript at 221.

6. Lindsay and Krag claim that the trial court erroneously "relied on the best interest standard alone" in determining that Barbara rebutted the presumption that Lindsay should have custody of T.C. Appellant's Brief at 24. "To the extent that a judgment may be based on superfluous findings and conclusions which are not fatal to the judgment, those findings and conclusions will not warrant reversal even if they are erroneous." *Ahuja v. Lynco Ltd. Med. Research*, 675 N.E.2d 704, 707 (Ind.Ct.App.1996), *trans. denied* (1997). Since the evidence is sufficient to support the trial court's finding that Lindsay is unable to care for T.C., and since this finding supports the trial court's judgment denying the petition to terminate Barbara's guardianship, we need not address this question further.

7. Although the trial court's order refers simply to "child care expenses," we note that the child support obligation worksheet prepared by the trial court refers specifically to work-related child care expenses.

*Fields v. Fields,* 749 N.E.2d 100, 104 (Ind. Ct.App.2001) (citations omitted), *trans. denied.*

Lindsay and Krag direct us to Indiana Child Support Guideline 3(E)(1), which governs work-related child care expenses and reads as follows:

> Child care costs incurred due to employment or job search of either parent, should be added to the basic obligation. It includes the separate cost of a sitter, day care, or like care of a child or children *while the custodial parent works or actively seeks employment.* Such child care costs must be reasonable and should not exceed the level required to provide quality care for the children. Child care costs required for active job searches are allowable on the same basis as costs required in connection with employment.

(Emphasis added.) Lindsay and Krag observe that Barbara, a retiree, is neither working nor actively seeking employment. Thus, they argue, the trial court erred in ordering Krag to pay Barbara for work-related child care expenses under Child Support Guideline 3(E)(1).

Barbara refers us to the guideline's accompanying commentary, which reads in relevant part as follows:

> Work-related child care expense is an income-producing expense of the parent. Presumably, if the family remained intact, the parents would treat child care as a necessary cost of the family attributable to the children when both parents work. Therefore, the expense is one that is incurred for the benefit of the child(ren) which the noncustodial parent should share.

Ind. Child Support Guideline 3(E) (commentary). Barbara reminds us that both Lindsay and Krag work full time, and that if the family (i.e., Lindsay and Krag) remained intact, they would incur a work-related child care expense. Thus, Barbara argues, the trial court properly included that expense in calculating child support.

We cannot agree. As T.C.'s guardian, Barbara is the custodial parent contemplated by Child Support Guideline 3(E)(1). Since she is neither working nor actively seeking employment, she is not entitled to payment for work-related child care expenses. We therefore reverse that portion of the trial court's order requiring Krag to pay Barbara $60 weekly toward child care expenses. In all other respects, we affirm the trial court's judgment.

Affirmed in part and reversed in part.

MATHIAS, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting.

I respectfully dissent from the majority's conclusion that the trial court did not abuse its discretion in denying Lindsay and Krag's petition to terminate Barbara's guardianship.

It is well-settled that when a parent initiates an action to obtain custody, a non-parent seeking to retain custody must bear the burden of overcoming the parent's presumptively superior right to custody. *Hunt v. Whalen,* 565 N.E.2d 1109, 1110–11 (Ind.Ct.App.1991). However, the manner in which this presumption is rebutted has been subjected to various interpretations. In *Froelich v. Clark,* 745 N.E.2d 222 (Ind. Ct.App.2001), *trans. denied,* this court evaluated the relevant case law, statutory amendments, and constitutional concerns, holding that the following is the appropriate standard for court to apply when considering a parent/non-parent child custody dispute:

> First, there is a presumption in all cases that the natural parent should have custody of his or her child. The third party

bears the burden of overcoming this presumption by clear and cogent evidence. Evidence sufficient to rebut the presumption may, but need not necessarily, consist of the parent's present unfitness, or past abandonment of the child such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. However, a general finding that it would be in the child's "best interest" to be placed in the third party's custody is not sufficient to rebut the presumption. If the presumption is rebutted, then the court engages in a general "best interests" analysis. The court may, but is not required to, be guided by the "best interests" factors listed in Indiana Code Sections 31–14–13–2, 31–14–13–2.5, 31–17–2–8, and 31–17–2–8.5, if the proceeding is not one explicitly governed by those sections. If a decision to leave or place custody of a child in a third party, rather than a parent, is to be based solely upon the child's "best interests," as opposed to a finding of parental unfitness, abandonment, or other wrongdoing, such interests should be specifically delineated, as well as be compelling and in the "real and permanent" interests of the child.

*Id.* at 230–31. (citation omitted).

I believe that the trial court's findings do not support the judgment denying Lindsay and Krag's petition to terminate Barbara's guardianship of T.C. A non-parent seeking custody of a child is required to prove the parent's unfitness at the present time, not at some time in the past. *Froelich,* 745 N.E.2d at 232. In the present case, it is my determination that Barbara failed to rebut Lindsay's presumptively superior right to custody with clear and cogent evidence showing that Lindsay was presently unfit. *Id.* Although the majority acknowledges the fact that the trial court did not specifically find that Lindsay was presently an unfit parent, the majority chose to base its decision on the trial court's finding that "Barbara's concerns about Lindsay's inability to care for T.C. are justified." (Appellant's Appendix at 56).

A review of the trial court's findings shows that Lindsay had a "sketchy" employment history. (Appellant's Appendix at 54). In fact, Lindsay was fired from three jobs in the past. The evidence also reflects Lindsay's history of not paying bills in a timely manner and that she maintained a messy home. However, there were also findings presented by the trial court that Lindsay is presently employed and has been employed at the same job for the past seven months. The job pays above minimum wage and her employer considers her to be a good employee. Lindsey also has moved into her own house in order to provide a home for T.C. I believe that Barbara had the burden to prove Lindsay's unfitness at the present time, not at some time in the past. The trial court's findings do not support Barbara's contention that Lindsay is presently an unfit mother. *See Froelich,* 745 N.E.2d at 230–31; *Harris v. Smith,* 752 N.E.2d 1283, 1290 (Ind.Ct.App.2001).

Additionally, there is no finding that Lindsay voluntarily relinquished T.C. for any considerable amount of time. It is clear from the findings of the trial court that Lindsay and Krag initially consented to placing T.C. in Barbara's custody for the purpose of providing medical insurance. However, Lindsay and Krag have always remained active in T.C.'s life. The findings also show that Barbara allowed Lindsay to take T.C. and move in with Krag. Further, Barbara allowed Lindsay to live alone with T.C. in the Winslow Farms house. Barbara may have been the

court appointed guardian of T.C., but she permitted Lindsay to act as a primary caretaker of T.C. From the time of T.C.'s birth until the time of filing the petition, Lindsay and Barbara co-parented and shared the parenting responsibilities of T.C., from his physical care to transporting him to and from daycare. Therefore, I find that Lindsay never voluntarily relinquished her maternal role with T.C. to a degree that the affections of T.C. and Barbara are so interwoven that to sever them would seriously mar and endanger the future happiness of T.C. *See id.*

Finally, Lindsay did not acquiesce in the guardianship by relying heavily upon Barbara for help in caring for T.C. It is true that Barbara provided for T.C. and Lindsay financially, but I believe that financial reasons alone are insufficient to rebut the presumption of the fundamental and superior right of Lindsay to have custody of her child. It would undermine public policy to base a petition for termination of guardianship on financial reasons alone. Thus, I decline to promote such a policy. The Record shows that Barbara never intended for the guardianship to last forever. T.C. will not be the first or the last minor child to be raised by a single or divorced mother who is receiving assistance from a third party. To deny Lindsay her superior right to parent T.C. based on the evidence presented to the trial court is violative of her fundamental right to parent. *See Harris*, 752 N.E.2d at 1288–89. As we noted in *Froelich*, 745 N.E.2d at 233:

> For the sake of children, society should encourage parents who are experiencing difficulties raising them to take advantage of an available "safety net," such as a grandparent who is willing to accept temporary custody of a child. It would discourage such action by parents in difficult straits and discourage efforts to "reform" or better their life situation if their chances of later reuniting with their children were reduced.

In the present case, Lindsay took advantage of the available "safety net" in Barbara for the past five years. Lindsay now has a full-time job, a house, and a way to provide health insurance for T.C. The trial court did not find Lindsay to be an unfit parent. In fact, the trial court found that Lindsay was capable of sharing the parental responsibilities of T.C. on a half-time basis with Barbara. I think that the majority failed to consider this fact when it changed the standard from proving a parent is "presently unfit" to "a non-parent proving that her concerns about the parent's inability to care for a child are justified."

Consequently, I find that the trial court's findings do not reveal that Lindsay is an unfit parent, that she voluntarily relinquished her maternal role with T.C. to a degree that the affections of T.C. and Barbara are so interwoven that to sever them would seriously mar and endanger the future happiness of T.C., or that her conduct constitutes a long acquiescence of T.C. to Barbara. *See Froelich*, 745 N.E.2d at 230–31. Nor do I believe that the findings reveal the existence of any compelling, real and permanent interest of T.C. that would be best served by the continuance of Barbara's guardianship. *Id.* Accordingly, I conclude that the trial court abused its discretion when it denied Lindsay and Krag's Petition to Terminate Guardianship and Restore Custody of Minor Child to Mother with Appropriate Order for Father because the findings of the trial court were insufficient to rebut the presumption in favor of Lindsay's obtaining custody of T.C. *See In re Paternity of J.A.C.*, 734 N.E.2d 1057, 1059 (Ind.Ct.App. 2000). Therefore, I dissent.