

FILED
Nov 10 2015, 10:17 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| R. Patrick Magrath | Andrea L. Ciobanu |
| Alcorn Sage Schwartz & Magrath, LLP | Alex Beeman |
| Madison, Indiana | Ciobanu Law, P.C. |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| In the Matter of the Guardianship of B.W.; | November 10, 2015 |
| E.W., | Court of Appeals Case No. 40A01-1501-GU-27 |
| *Appellant-Respondent,* | Appeal from the Jennings Circuit Court |
| v. | The Honorable Jon W. Webster, Judge |
| L.G., | Trial Court Cause No. 40C01-0910-GU-45 |
| *Appellee-Petitioner* | |

**Robb, Judge.**

# Case Summary and Issue

[1] C.F. ("Grandmother") filed a petition for guardianship over B.W., which the trial court granted. E.W. ("Mother") consented to the guardianship. Four-and-a-half years later, L.G. ("Great Aunt") filed a petition requesting she be appointed guardian over B.W. Soon after, Grandmother filed a petition to

terminate her guardianship over B.W. Grandmother's petition stated the guardianship was no longer necessary because Mother was now "capable of and is caring for the minor child." Appellant's Appendix at 16. The trial court scheduled a hearing for both petitions on December 4, 2014.

[2] During the hearing on December 4, 2014, the trial court granted Grandmother's petition to terminate guardianship but took Great Aunt's petition under advisement. The trial court subsequently awarded Great Aunt custody of B.W. Mother appeals the trial court's order, raising two issues for our review, one of which we find dispositive: whether the trial court's findings establish Great Aunt has rebutted the presumption that B.W.'s interests would be best served by placement with her natural parent. Concluding the findings fail to support the trial court's judgment that Great Aunt has overcome the presumption in favor of Mother by clear and convincing evidence, we reverse and remand with instructions.

## Facts and Procedural History

[3] Mother gave birth to B.W. on September 19, 2009. B.W. tested positive for methadone at birth. As a result, the Indiana Department of Child Services ("DCS") placed B.W. with Grandmother and initiated Child in Need of Services ("CHINS") proceedings. Thereafter, at the suggestion of DCS, Grandmother filed a petition for guardianship over B.W. Mother consented to the guardianship; due to her substance abuse, Mother was unable to care for

B.W. at that time. DCS dismissed the CHINS petition after the trial court appointed Grandmother guardian over B.W on January 19, 2010.

[4]     From approximately September 2009 to May 2010, B.W. lived with Grandmother. Great Aunt and Great Aunt's mother ("Great Grandmother")[1] also lived with Grandmother during this time. Great Aunt cared for both Great Grandmother and B.W. while Grandmother was at work.

[5]     In May 2010, B.W., Great Aunt, and Great Grandmother moved out of Grandmother's house and into Great Grandmother's newly constructed house. Grandmother agreed B.W. should live with Great Aunt. Unlike Great Aunt, Grandmother worked during the day, and Grandmother did not want to place B.W. in daycare at such a young age. In addition, Grandmother was then going through a divorce and believed Great Aunt's house would be "the best stable place for [B.W.]." Transcript at 93.

[6]     From May 2010 to May 2014, B.W. lived primarily with Great Aunt, and Mother visited B.W. only ten to fifteen times. Mother continued to struggle with substance abuse. In 2012, Mother was convicted of operating a vehicle while intoxicated, and Mother admits she used hydrocodone and methamphetamine from 2012 to 2013. Mother agrees Great Aunt "took good

---

[1] Great Grandmother is also Grandmother's mother.

care of B.W., loved B.W. very much[,] and formed a bond with B.W." during this period. Appellant's Brief at 9.

[7] In mid-2013, Mother stopped using drugs when she became pregnant with her second child, K.W. Mother moved in with Grandmother, and the child was born in April 2014 without drugs in her system. Around this time, Mother attempted to have more contact with B.W., but Great Aunt would not allow Mother to see B.W. According to Grandmother, "[Great Aunt] was trying to . . . keep [Mother] and [B.W.] apart. She wasn't allowing [Mother] to be around [B.W.]," even after Mother had been "clean for a number of months." Tr. at 95-96. Great Aunt told Grandmother, "I'm [B.W.]'s mother. I'm not going to allow anybody else to raise her." *Id.* at 97.

[8] In May 2014, following a visit with Great Grandmother in the hospital, Grandmother suggested she take B.W. for the night. Great Aunt said, "Okay, bring her back tomorrow," but Grandmother stated she would not be bringing B.W. back. *Id.* at 23-24. From May 2014 to September 2014, Mother, B.W., and K.W. lived with Grandmother, and Grandmother observed Mother caring for B.W. and K.W. In addition, Mother completed certified nurse aide ("CNA") training and began working as a CNA, a job that requires Mother to submit to random drug screening.

[9] Nevertheless, Great Aunt filed a petition in June 2014 requesting she be appointed guardian over B.W. In July 2014, Grandmother filed a petition to terminate her guardianship over B.W. Grandmother's petition stated the

guardianship was no longer necessary because Mother was now "capable of and is caring for the minor child." Appellant's App. at 16. The trial court scheduled a hearing for both petitions on December 4, 2014.

[10] In the months leading up to the hearing, Mother moved in with her boyfriend. Mother took B.W. and K.W. with her, but maintained contact between B.W. and Great Aunt. During the hearing on December 4, 2014, the trial court granted Grandmother's petition to terminate guardianship but took Great Aunt's petition under advisement after hearing testimony from six witnesses, including Mother, Grandmother, and Great Aunt. Mother acknowledged the bond between Great Aunt and B.W. and stated she wants Great Aunt to continue to have a relationship with B.W. But Mother also stated she believes Great Aunt's role "should be as a great aunt." Tr. at 65. Mother testified she wants to have a mother-daughter relationship with B.W. *Id.* at 54 ("My intent is to have the relationship that I'm supposed to have with my daughter . . . .").

[11] At the time of the hearing, Mother had been working as a CNA for five months, had a place to live, had no criminal charges pending, and had passed the last random drug screen administered by her employer in September 2014. Great Aunt admitted she had little to no firsthand knowledge of what was "going on" in Mother's life. *Id.* at 44. Grandmother testified to Mother's sobriety and the other lifestyle changes Mother had made since becoming pregnant with K.W.:

> Q     Okay in the state that [Mother] was in at certain times
>       because of her drug addiction, were there times that you

would not have allowed her around your granddaughter?

A      Yes there were times that I would not have allowed it.

Q      Let me ask you this. If [Mother] was using drugs and on drugs, would you let [B.W.] be around her?

A      No.

Q      Now, I want to move forward. [Mother] testified that she has been clean for a year. Based upon your observations, do you believe that to be true?

A      I do.

Q      Have you seen your daughter over the years when she was using drugs?

A      Yes I have.

Q      And over the past 12 months, does she appear to be sober to you?

A      Yes she does.

Q      What kind of changes have you seen since, say, two years ago to now in your daughter?

A      Complete. She doesn't do drugs. She works. She studies, you know, for her CNA. She takes care of [K.W.] and [B.W.]. She's their mom. . . . I would have never allowed that before.

Q      Okay if you thought [B.W.] was in any danger of being in [Mother]'s care, would you have allowed that to happen?

A      No.

Q    Would you have maintained your guardianship?

A    Yes I would.

*Id.* at 94-95.

In an order dated December 29, 2014, the trial court awarded Great Aunt custody of B.W. The order included the following findings of fact:

> 2. [B.W.] was born September 19, 2009. She is five (5), now living with [Mother] and her boyfriend in Seymour, Indiana.
>
> 3. While this case arises in the context of guardianship, it is, in reality, a third party custody dispute with the heightened burden of proof on [Great Aunt]. The higher courts of this state recognize this situation as well.[2]

---

[2] Indiana Code section 29-3-5-3(a) provides the standard for appointment of a guardian:

> [I]f it is alleged and the court finds that:
>     (1) the individual for whom the guardian is sought is an incapacitated person or a minor; and
>     (2) the appointment of a guardian is necessary as a means of providing care and supervision
>         of the physical person or property of the incapacitated person or minor;
> the court shall appoint a guardian under this chapter.

By contrast, the trial court determines custody "in accordance with the best interests of the child." Ind. Code § 31-17-2-8. In determining the child's best interests, the trial court considers "all relevant factors," including the following:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at
>     least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>   (A) the child's parent or parents;
>   (B) the child's siblings; and
>   (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
>   (A) home;
>   (B) school; and
>   (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either parent.

4. . . . [Great Aunt] is a devout Catholic, who had [B.W.] baptized Catholic with [Mother]'s and [Grandmother]'s consent. While [Mother] has no problem with [B.W.] being Catholic, [Mother] is not actively involved in any religious faith.

5. When [B.W.] was born, in 2009, she, [Great Aunt], . . . and [Great Grandmother] were living with [Grandmother] in [Grandmother]'s home, until [Great Grandmother] got her new home completed. Around May, 2010, [Great Aunt], [B.W.], and [Great Grandmother] all moved out of [Grandmother]'s home and into [Great Grandmother]'s new home.

6. From this point, [B.W.] lived with [Great Aunt] exclusively until May, 2014, when [Grandmother] took her and refused to return her for reasons still unclear to [Great Aunt]. In other words, from birth until May, 2014, [Great Aunt] and [B.W.] lived together and [Great Aunt] was her maternal figure. [Great Aunt] was her de facto custodian.

7. [Great Aunt] has not had gainful employment outside the home since 2009. She cared for [Great Grandmother] and [Great Grandmother] supported [Great Aunt] financially. [Great Aunt's husband] is now the bread winner in the family.

8. [Mother] is now twenty-six (26) years of age, employed as a C.N.A. at The Waters of Scottsburg nursing home. She has held that position since July, 2014. She had last worked in 2010. [Mother] has a young female child, [K.W.], who is six (6) months of age. [K.W.] lives with [Mother]. [Great Aunt] and

---

(8) Evidence that the child has been cared for by a de facto custodian . . . .

*Id.* In *In re Guardianship of L.L.*, 745 N.E.2d 222, 227 (Ind. Ct. App. 2001), *trans. denied*, we recognized that when "a guardianship proceeding . . . is, in essence, a child custody proceeding that raises important concerns about parental rights and the 'best interests' of children," we generally apply "a more detailed test than might arguably be required by the plain language of the [guardianship] statute."

[K.W.] have had contact. [Mother] does not know who [K.W.]'s father is claiming she was conceived while she was high.

9. [Mother] and [Great Aunt] have had little contact with one another in 2014.

10. From May, 2010, until May, 2014, [Mother] saw [B.W.] "10 to 15" times, but never overnight.

11. The original guardianship was the end result of a C.H.I.N.S. proceeding . . . after [B.W.] was born with methamphetamine in her system that resulted in health issues from the start.[3] [Mother] continued to struggle with drugs even after [B.W.]'s birth. [Mother] says she has been clean for about one (1) year. [B.W.] was placed with [Great Aunt] by [Grandmother] shortly after the guardianship was opened on January 19, 2010.

12. [Mother] admits there is a close bond between [B.W.] and [Great Aunt], but that severing that relationship will not harm [B.W.].[4] During the time [B.W.] was with [Great Aunt], [Mother] provided no financial support nor did she provide for any of [B.W.]'s medical or dental needs.

13. [Mother] admits methamphetamine use from 2012 to 2013.

14. In 2012, [Mother] was convicted of Driving Under the Influence. [Mother] indicated the birth of [K.W.] was motivation enough to come clean and end her polysubstance abuse.

15. [Mother] is working day shift earning Eleven and no/100

---

[3] B.W. tested positive for methadone at birth, not methamphetamine. Tr. at 53.

[4] Mother testified she did not believe the change in custody would be harmful to B.W. because, "[B.W.] knows that [Great Aunt] still loves her and [Great Aunt] cares tremendously for her." Tr. at 55.

Dollars ($11.00) per hour.  She has no valid driver's license.  She is a high school graduate.

16.  [B.W.] ended up with [Great Aunt] in the first place around May, 2010, because [Grandmother] was working days and going through a divorce.  [Grandmother] and [Great Aunt] agreed [B.W.] would live with [Great Aunt].  Apparently, all of this done with [Mother]'s knowledge and tacit approval and acquiescence.

Appellant's App. at 19-21.

[13]  Based on these findings of fact, the trial court concluded, "[B.W.] has formed a strong emotional bond with [Great Aunt] and to sever that bond after four and one-half (4 ½) years of allowing it to form is not in [B.W.]'s best interest."  *Id.* at 23.  Mother now appeals the trial court's order awarding Great Aunt custody of B.W.

# Discussion and Decision

## I.  Standard of Review

[14]  "We review custody modifications for abuse of discretion with a preference for granting latitude and deference to our trial judges in family law matters."  *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (citation and internal quotation marks omitted).  "But to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result."  *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 941 (Ind. 2005).

In addition, the trial judge in this case entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). In reviewing findings and conclusions made pursuant to Rule 52, we first determine whether the evidence supports the findings and then whether findings support the judgment. *K.I.*, 903 N.E.2d at 457.

> In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Those appealing the trial court's judgment must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them *de novo*.

*Smith v. Smith*, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010) (citations omitted).

## II. Natural Parent Presumption

In a custody dispute between a natural parent and a third party, there is a strong presumption in all cases that the natural parent should have custody of his or her child. *In re L.L.*, 745 N.E.2d at 230 (holding "de facto custodian" status does not remove the presumption in favor of natural parents obtaining or retaining custody of their children). "[B]efore placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002). The

trial court must be convinced that placement with a third party "represents a substantial and significant advantage to the child." *Id.*

[17] The issue is not merely the "fault" of a natural parent; "[r]ather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person." *Id.* Evidence sufficient to rebut the presumption may, but need not necessarily, include the parent's present unfitness, long acquiescence, or past abandonment of the child "such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child." *In re L.L.*, 745 N.E.2d at 227, 230-31.

[18] Moreover, "detailed and specific findings are required." *In re B.H.*, 770 N.E.2d at 287. A generalized finding that placement with a third party is in the child's best interests is insufficient to overcome the presumption in favor of the natural parent. *Id.* And if a decision to place custody of a child in a third party, rather than a parent, is based solely upon the child's "best interests," as opposed to a finding of parental unfitness, abandonment, or other wrongdoing, "such interests should be specifically delineated, as well as be compelling and in the real and permanent interests of the child." *In re L.L.*, 745 N.E.2d at 231 (citation, emphasis, and internal quotation marks omitted).

[19]     Applying this standard to the present case, we cannot conclude the trial court's findings support the judgment awarding Great Aunt custody of B.W. The findings are simply inadequate to rebut the presumption in favor of B.W.'s natural parent. First, the findings do not specifically state why placement with Great Aunt is necessary or how B.W.'s best interests will be "substantially and significantly" served by placement with Great Aunt. *In re B.H.*, 770 N.E.2d at 287.

[20]     Second, none of the trial court's findings suggest Mother is presently unfit.[5] Although Mother has had difficulties with substance abuse in the past, the trial court found, "Mother says she has been clean for about one (1) year," and nothing in the findings contradict this statement. Appellant's App. at 21. The trial court also found Mother has a place to live, is employed as a CNA, and has been caring for K.W. without intervention by family members or the DCS. It was Great Aunt's burden to prove Mother's unfitness at the time of the hearing, not at some time in the past.

[21]     Finally, while it is undisputed "[B.W.] has formed a strong emotional bond with [Great Aunt]," *id.* at 23, this generalized finding is insufficient to overcome the presumption in favor of Mother. Furthermore, the evidence simply does

---

[5] The relevance of several of the trial court's findings is not entirely clear. For instance, the fact that "[Mother] and [Great Aunt] have had little contact with one another in 2014," seems, at best, only minimally relevant to the best interests of B.W. Appellant's App at 21. Likewise, that "[Great Aunt] is a devout Catholic," while "[M]other is not actively involved in any religious faith," does not speak to Mother's parental fitness. *Id.* at 20. And finally, the fact that "[Mother] does not know who [K.W.]'s father is," is not, in any proper sense, probative of Mother's fitness with regard to B.W. *Id.*

not support the trial court's finding that this "strong emotional bond" will be "severed" by allowing Mother to retain custody. *Id.* Mother wants Great Aunt to continue to have a relationship with B.W. Although the character of Great Aunt's relationship with B.W. will undoubtedly change, this fact alone does not mean their bond will be severed. To sever means "to end (a relationship, connection, etc.) completely." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/sever (last visited Oct. 28, 2015). But even if the bond would be severed, the trial court's finding that Great Aunt has been a "maternal figure," Appellant's App. at 20, does not specifically demonstrate that severing the bond between Great Aunt and B.W. would "seriously mar and endanger the future happiness of [B.W.]" *In re L.L.*, 745 N.E.2d at 230-31.

[22] We do not wish to minimize Great Aunt's relationship with B.W., but we cannot conclude Great Aunt has rebutted the presumption in favor of Mother. Mother consented to guardianship by Grandmother in 2009 because Mother recognized she was then unable to care for B.W. In the past year, however, Mother has taken steps to better herself and create a stable environment for her children, and Grandmother agrees Mother is ready to take responsibility for B.W. As we stated in *In re Guardianship of L.L.*,

> For the sake of children, society should encourage parents who are experiencing difficulties raising them to take advantage of an available "safety net," such as a grandparent who is willing to accept temporary custody of a child. It would discourage such action by parents in difficult straits and discourage efforts to

"reform" or better their life situation if their chances of later reuniting with their children were reduced.

*Id.*

# Conclusion

[23] In a custody dispute between a natural parent and a third party, we recognize a strong presumption that a child's best interests will be served by placement with his or her natural parent. In the present case, the trial court's findings fail to support the judgment that Great Aunt has clearly and convincingly overcome the presumption in favor of Mother. We therefore reverse and remand, with instructions to vacate the order awarding Great Aunt custody of B.W.

[24] Reversed and remanded.

Vaidik, C.J., and Pyle, J., concur.