**FOR PUBLICATION**



**FILED**
Dec 18 2014, 8:13 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ELIZABETH A. BELLIN**
Elkhart, Indiana

ATTORNEY FOR APPELLEE:

**MARYELLEN BAKER**
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE GUARDIANSHIP OF M.N.S.; | ) | |
| | ) | |
| J.L.M., | ) | |
| Appellant/Respondent, | ) | No. 20A05-1308-GU-438 |
| | ) | |
| v. | ) | |
| | ) | |
| M.S.S., | ) | |
| Appellee/Petitioner. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause No. 20D01-0404-GU-46

**December 18, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

## STATEMENT OF THE CASE

In this appeal, we are called upon to review a trial court's order granting a natural parent's motion to terminate a guardianship held by a third party over the natural parent's child. J.L.M. ("Guardian") appeals the trial court's order granting M.S.S.'s ("Father") motion to terminate the guardianship over M.N.S. ("Child"), arguing that she presented clear and convincing evidence that Child should remain in her care.

After carefully reviewing the entire record, including the transcript of the three days of hearings and the trial court's thorough and well-reasoned findings of fact and conclusions thereon, we conclude that Guardian did not meet her burden of showing that the best interests of Child were substantially and significantly served by placement with her. Accordingly, we affirm the trial court's order terminating the guardianship over Child.

We affirm.

## ISSUE

Whether the trial court erred by granting Father's petition to terminate the guardianship over Child.

## FACTS

Child was born in October 2003 to A.D. ("Mother") and Father, who were not married. Mother and Father also had another child, M.S., who was born in September 2006.[1] Guardian is Father's former step-mother.[2]

---

[1] Mother also has two other children who are not the children of Father. K.D., born in April 2000, and K., who was apparently younger than M.S.

[2] Guardian separated from Father's father in 2002, and they divorced in 2006.

2

While Mother was pregnant with Child, she lived with her mother ("Maternal Grandmother"). During Mother's pregnancy, Guardian "was around a lot," bought "a lot of stuff" for Child and "became really close to [Mother]." (Tr. 18).

About one month after Child was born, Mother moved in with Father at his father's trailer so that they "could raise [Child] together." (Tr. 19). Sometime in February 2004, Father went to prison after pleading guilty to theft. Mother and Child then moved to Maternal Grandmother's house.[3] While Mother worked, Father's mother ("Paternal Grandmother") and Guardian helped to babysit Child and helped cover the costs of an additional babysitter.

On February 23, 2004, Guardian had Mother sign a form granting Guardian temporary guardianship over Child. According to Mother, Guardian told Mother that she needed to sign the form so that Guardian could get medical care for Child while Guardian babysat Child. Thereafter, in April 2004, Guardian helped Mother to find an apartment and move out on her own. Mother then had difficulty taking care of Child and told Father about it while he was in prison. Father called Guardian and asked her if she would be able to help care for Child until his release from prison, and Guardian agreed. While Father was in prison, either Guardian or Paternal Grandmother took Child to visit with Father so he could see her every weekend.

On April 30, 2004, Guardian filed a petition to be appointed permanent guardian over Child and attached a written consent signed by Mother. At the time Guardian filed this petition, Father was still incarcerated, and Guardian did not tell him about the

---

[3] Maternal Grandmother had a guardianship over Mother's oldest child, K.D.

3

petition. On May 6, 2004, the trial court—noting that Mother had signed a consent and that Father was incarcerated in the Department of Correction—issued an order granting Guardian's petition for a permanent guardianship of Child.

In January 2005, Father was released from prison, placed in a Community Transition Program, and put on house arrest. Prior to Father's release, Father and Guardian had agreed that he could move in with her and Child, but once he was released, Guardian told him that he could not. Father then moved in with Paternal Grandmother but helped pay Child's babysitting costs. Father was able to have unsupervised visitation with Child.

At the end of January 2005, Guardian filed a motion for payment of child support, seeking to obtain child support from Mother only. At that same time, Mother filed a motion to terminate the guardianship, stating that there was "no further need for a guardianship" because she was able and willing to care for Child. (App. 489). Father backed Mother's efforts to terminate the guardianship.

The trial court held a hearing on February 4, 2005, and appointed a guardian ad litem ("GAL") to represent Child's interests. During the hearing, Mother agreed to pay $50.00 per week to the clerk of the court. Father was also present at the hearing and voluntarily agreed to pay $60.00 per week directly to Guardian. Thereafter, between 2005 and 2010, Father paid child support directly to Guardian.

In September 2006, Mother gave birth to M.S. A few weeks later, Father and Mother broke up. After M.S.'s birth, Mother apparently did nothing to pursue her

4

petition to terminate the guardianship. On September 18, 2006, the trial court ordered that the guardianship case was "ordered off the active docket." (App. 6).

On November 26, 2007, Father filed a handwritten minute sheet with the trial court, stating that he "would like to have more visitation with [Child] and[/]or custody." (App. 457).[4] The trial court determined that it was "not a proper pleading" and declined to take any action on Father's request. (App. 6).

There was animosity between Guardian and Father, and it apparently peaked in December 2009. During that month, Guardian filed a police report, alleging that Father had assaulted her.[5] She also signed an agreement with the Title IV-D Prosecutor to have the State enforce her support rights for Child.[6] Additionally, Guardian filed for a protective order against Father on behalf of herself and Child. The trial court held a hearing in the protective order case in January 2010 and modified Father's parenting time to supervised visitation at CAPS.[7] This protective order prevented Father from seeing or talking to Child outside of his visitation time.

Also in December 2009, Father filed another handwritten minute sheet. The trial court "in the exercise of its discretion" set the matter for a hearing. (App. 6). The trial court held a review hearing on May 3, 2010. During this hearing, the GAL recommended

---

[4] Father also sought to move the guardianship to another court due to the fact that the trial judge in the guardianship case was the sentencing judge in his criminal case.

[5] In February 2010, the State charged Father with battery against Guardian. In August 2011, the trial court held a bench trial, during which Child testified, and found Father not guilty.

[6] In March 2010, the Title IV-D Prosecutor filed a motion to intervene in the guardianship case and sought a hearing on Mother's and Father's support arrearages.

[7] CAPS is "a non-profit organization that provides services to parents and children in the Elkhart county community." (Tr. 396). CAPS sent the trial court reports of Father's supervised visits with Child.

that Father's visitation should be moved to unsupervised visitation. During the hearing, Guardian tendered a petition to adopt Child and attached a written consent from Mother.[8]

Following the hearing, the trial court requested the GAL to submit an updated report regarding parenting time. On June 9, 2010, the GAL filed a report with the trial court. In this report, the GAL recommended that Father's unsupervised parenting time be reinstated. The GAL also stated that Father did not present a danger to Child during his parenting time.

On July 29, 2010, the trial court held a status conference to address the GAL's report. Guardian requested that Father be required to submit to random drug testing before having any unsupervised visitation. Father admitted that any drug screen would likely not come back clean because had recently smoked marijuana. The trial court then ordered Father to submit to a hair follicle test within twenty-four hours. Father's test results tested positive for marijuana. Thereafter, for approximately the next year, the trial court ordered Father to submit to random drug screens, including urinalysis and hair follicle examinations; these later examinations indicated no drug use.

In November 2010, Father made an oral request for unsupervised parenting time outside of CAPS, but the trial court denied his request and kept Father's supervised parenting time in place. Later, in April 2011, Father filed a petition to modify visitation. In his petition, Father asserted that he had had negative drug screens and consistent, "positive" visits with Child at CAPS, and he requested that the trial court modify his

---

[8] Mother testified that she signed the consent because Guardian had threatened her.

6

visitation from supervised to unsupervised visitation. (App. 275). Also in April 2011, Father was granted custody of Child's younger sister, M.S.

On July 7, 2011, the trial court granted Father's petition to modify visitation and ordered that Father was to have unsupervised parenting time once a week for a period of four hours. The trial court also "ADMONISHED" the parties that they were not to discuss this matter with Child and were not to make any "disparaging comments" about any of the parties. (App. 249).

On December 13, 2011, Father filed a petition to terminate the guardianship over Child. In his petition, Father asserted that the "reasons for the initial guardianship are no longer in effect: father is no longer incarcerated and is able to be the minor child's stable and regular caregiver." (App. 222). Father also stated that Mother was "in agreement that the guardianship [was] no longer necessary." (App. 222). The trial court set a hearing on Father's termination petition for February 6, 2012.

Also in December 2011, Guardian made a report to Indiana Department of Child Services ("DCS") and alleged that Father had left bruising on Child. DCS met with Child but did not see any bruising. After DCS met with Father to investigate the alleged incidents of abuse, it determined that the allegation of abuse of Child by Father was unsubstantiated. Thereafter, Guardian filed for and received an ex parte protection order against Father on behalf of herself and Child.

On January 23, 2012, the trial court held a status hearing, during which Father tendered a copy of the DCS report that determined that any allegation of abuse of Child

by him was unsubstantiated. The trial court ordered that the parties should exchange Child at local police departments.

In February 2012, the trial court set a hearing on Father's guardianship termination motion for July 3, 2012. Mother later moved for a continuance of the hearing, which the trial court granted over Father's objection. Thereafter, the hearing was set for October 12, 2012.

In July 2012, Father married Mi.S. ("Stepmother"). Also in July 2012, Father filed a motion for extended parenting time and sought to have parenting time in accordance with the Indiana Parenting Time Guidelines. On July 30, 2012, the trial court entered a temporary order granting Father's motion for extended parenting time. In its order, the trial court ruled that Father would have overnight parenting time on alternating weekends, and the trial court "admonished" the parties "to fully cooperate with one another[.]" (App. 190).

On October 9, 2012, the GAL filed a report with the trial court. In her report, the GAL recognized that Father had stabilized his life. The GAL also acknowledged that Father had primary custody of his other daughter, M.S., who was Child's full-blooded sibling, and that the GAL had recommended that Father get custody of M.S. during a prior custody hearing between Father and Mother. When discussing the relationship between Father and Guardian, the GAL noted that it was "openly hostile and has, at times, bordered on violent." (App. 176). The GAL acknowledged that Guardian had contributed to the hostility and had attempted to prevent Child from spending time with Father. Nevertheless, the GAL recommended that Child remain in Guardian's care.

8

On October 12, 17, and December 19, 2012, the trial court held evidentiary hearings on Father's petition to terminate the guardianship and on Guardian's petition for a protective order.[9] The trial court also held a "lengthy" in-camera interview with Child on October 26, 2012. (App. 50). During the interview, Child told the trial judge that she missed her older and younger sister and wanted to spend more time with them.[10]

Over these three days of hearings, both Father and Guardian presented testimony from witnesses supporting their respective sides as well as arguments as to why the trial court should award custody of Child to him or her.[11] The testimony revealed that Child had formed a bond with both Guardian and with Father.

When the GAL testified about her prior report and recommendation, she stated that she had observed Guardian and Child five or six times but had never observed the interaction of Father and Child. The GAL testified that her recommendation that Child remain with Guardian was based on the bond between Child and Guardian, whom Child considered as a mother. The GAL testified, however, that Father had "done a very good job turning his life around." (Tr. 418). Additionally, she testified that she was concerned that Guardian or Father would each try to exclude the other from Child's life. When asked about Guardian's protective order that had been in effect against Father for the majority of the guardianship, the GAL testified that Guardian "ha[d] done all she c[ould]

---

[9] The December 19 hearing lasted more than twelve hours and lasted until approximately 9:30 p.m.

[10] Father had custody of Child's younger sister, and Maternal Grandmother had custody of Child's older sister.

[11] Mother testified that she was in favor of Father's motion to terminate the guardianship.

to avoid [Child] spending time with [Father]." (Tr. 415). The GAL testified that "if it were up to [Guardian] that [Child] would not have contact with [Father]." (Tr. 420). The GAL also testified that both Father and Guardian were "extremely important" to Child and opined that it would be "detrimental" to Child if one of them was not an "active part of her life[.]" (Tr. 408).

At the end of the three days of hearings, the trial court took the matters under advisement and stated that it would issue findings and conclusions under Trial Rule 52. In the meantime, on December 20, 2012, the trial court issued an order increasing Father's parenting time to two weekends per month from Friday at 6:00 p.m. to Sunday at 6:00 p.m. Also, on December 21, 2012, the trial court issued an order granting Guardian's petition for a permanent protective order against Father for Guardian only.

On April 11, 2013, the trial court issued an order granting Father's petition to terminate the guardianship, effective April 26, 2013 at 6:00 p.m.[12] The trial court made specific and extensive findings—including findings addressing witness credibility—and thoroughly discussed the burden of Father as a natural parent and the burden of Guardian as a third party in this guardianship proceeding. The trial court concluded that the evidence presented, "combined with the presumption that the child's best interests are served by placement with the natural parent," showed that Father had met his initial burden. (App. 56). Additionally, the trial court acknowledged that a bond had been established between Guardian and Child but concluded that "Guardian ha[d] not met her burden of showing by clear and convincing evidence that the Child's interests are

---

[12] We commend the trial court on the detailed nature of its order and the well-reasoned analysis contained therein.

10

significantly served in continuing Guardian's primary custody of Child[.]" (App. 57). Ultimately, the trial court determined that it was "in Child's best interest to be placed in her Father's custody" and terminated the guardianship. (App. 57-58).

Thereafter, Guardian filed a motion to correct error, which the trial court denied after holding a hearing.[13] Guardian now appeals.

## DECISION

Guardian argues that the trial court erred by granting Father's petition to terminate her guardianship of Child.

Before we address Guardian's argument, we note that "[a]ll findings and orders of the trial court in guardianship proceedings are within its discretion." *In re Guardianship of Hollenga*, 852 N.E.2d 933, 936 (Ind. Ct. App. 2006) (citing IND. CODE § 29-3-2-4(a)). Therefore, we will review the trial court's order for an abuse of discretion. *Hollenga*, 852 N.E.2d at 937. Indeed, "[w]e review custody modifications[,]" such as the one that occurred in this termination of the guardianship, "for abuse of discretion with a 'preference for granting latitude and deference to our trial judges in family law matters.'" *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). In determining whether the trial court abused its discretion, we review the court's findings and conclusions, and we may not set aside the findings or judgment unless they are clearly erroneous. *In re Guardianship of J.K.*, 862 N.E.2d 686, 690-91 (Ind. Ct. App. 2007). We will not reweigh the evidence nor will we reassess the

---

[13] The trial court's order addressing Guardian's motion to correct error was also thorough and specifically addressed all arguments raised by Guardian.

11

credibility of witnesses; instead, we will consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

Guardianship proceedings are guided by statute. INDIANA CODE § 29-3-12-1(c)(4) provides that a trial court "may terminate any guardianship if . . . the guardianship is no longer necessary . . . ." However, "[i]n determining whether a guardianship should be terminated, . . . we have generally applied a more detailed test than required by the plain language of the [guardianship] statute." *Roydes v. Cappy*, 762 N.E.2d 1268, 1274 (Ind. Ct. App. 2002). Instead, we apply a standard similar to the one used in child custody modifications, which takes into account parental rights and the best interests of the child. *Id.*

"Indiana courts have long held that '[e]ven when a parent initiates an action to reobtain custody of a child that has been in the custody of another, the burden of proof does not shift to the parent . . . [r]ather, the burden of proof is always on the third party.'" *K.I.*, 903 N.E.2d at 460 (quoting *J.K.*, 862 N.E.2d at 692) (modifications in original)). However, as in other custody modification matters, a parent wishing to terminate a guardianship has the burden of persuading the trial court that termination is in the child's best interests and that there is a substantial change in one or more of the child-custody factors. *See Id.* (citing INDIANA CODE § 31-14-13-6) (relating to modification of custody in a paternity action). These are "modest requirements" where, as occurred here, the party seeking to modify custody is the natural parent of a child who is in the custody of a third party. *Id.* Indeed, there is a "'strong presumption that a child's interests are best served by placement with the natural parent.'" *Id.* (quoting *In re Guardianship of B.H.*,

12

770 N.E.2d 283, 287 (Ind. 2002), *reh'g denied*). "Hence, the first statutory requirement is met from the outset" and, "as a practical matter," the natural parent's burden of establishing a substantial change in one or more of the enumerated statutory factors "is no burden at all" or is, at the very least, "minimal." *Id.*

Once the natural parent meets this "minimal" burden of persuasion, the third party must prove "by clear and convincing evidence 'that the child's best interests are substantially and significantly served by placement with another person.'" *Id.* at 461 (quoting *B.H.*, 770 N.E.2d at 287).[14] If the third party fails to carry this burden, then custody of the child must be modified in favor of the natural parent. *Id.*

Guardian does not dispute that Father met his initial minimal burden as a natural parent in this proceeding to terminate the guardianship. Instead, Guardian asserts that she met her burden of showing clear and convincing evidence that Child should remain in her care. She argues that, as a result, the trial court erred by granting Father's petition to terminate the guardianship.

In support of her argument that the trial court erred by terminating the guardianship, Guardian argues that she showed that there was a strong bond between her and Child and that Father "had acquiesced custody of [Child] for a long period of time." (Guardian's Br. 20). Guardian also contends that "the trial court failed to take into

---

[14] Our Indiana Supreme Court has explained that "in a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person" could be—but would not be required to be—considered as factors in determining whether a third party had met its burden of overcoming the presumption favoring placement of a child with a natural parent and proving that a child's best interests were substantially and significantly served by placement with that third party. *B.H.*, 770 N.E.2d at 287 (citing *Hendrickson v. Binkley*, 316 N.E.2d 376, 380 (Ind. Ct. App. 1974), *cert. denied*).

13

account the potential harm that terminating the guardianship would have in severing the ties between Guardian and [Child]." (Guardian's Br. 20).

After reviewing the record on appeal and the trial court's comprehensive order, we disagree with Guardian's assertions of error. Here, the trial court held three days of hearings, during which it heard testimony from witnesses on behalf of both Guardian and Father.[15] At the time of the hearings, Father was married, employed, and had obtained custody of Child's younger sister, M.S. Additionally, the trial court held an in-camera interview with Child. Thereafter, the trial court issued a detailed order, which includes an analysis of the relevant issues and caselaw. Indeed, in its order granting Father's motion to terminate the guardianship, the trial court specifically recognized the bond between Guardian and Child and the resulting difficulty that would be involved in severing that bond. Furthermore, the trial court addressed and specifically rejected Guardian's argument that Father had voluntarily relinquished custody of Child to Guardian or had acquiesced to the current custody arrangement. The following finding seems to summarize the situation in this case:

> Guardian's initial considerations were for the Child's benefit and included that Father should establish a home, grow up, and stop using drugs. But as the years passed and Father had become more capable of retaking Child, Guardian's considerations have changed to focus more on her own feelings than on the best interests of the Child. There is growing protectionism on both sides that has led to serious discord between Guardian and Father and [Mother]. The best interests of the Child would include [for] all adults [to] stop fighting with each other; realizing that each has something valuable to contribute [to] the life of this Child; and cooperating for Child's benefit instead of acting selfish out of hate and jealousy of the other[.]

---

[15] We commend the trial court for the well documented record during the three days of hearings and for its guidance and patience shown to counsel for both parties during these hearings.

14

(Guardianship Termination Order at 5).[16]

Guardian's argument that trial court erred by terminating the guardianship is nothing more than a request to reweigh the evidence and reassess the credibility of the witnesses, which we will not do. Thus, we affirm the trial court's order granting Father's motion to terminate the guardianship over Child. *See, e.g.*, *K.I.*, 903 N.E.2d at 460-61 (affirming the trial court's order modifying custody of a minor from the child's grandmother to the child's father); *In re I.E.*, 997 N.E.2d 358, 364 (Ind. Ct. App. 2013) (refusing to reweigh the evidence or witness credibility and affirming the trial court's order terminating the guardianship where the guardian "failed to present evidence that clearly and convincingly established that [the child's] best interests would be substantially and significantly served by continued placement with the Guardians, such as to overcome the 'strong presumption' that custody of [the child] should be given to [the] natural father"), *reh'g denied*, *trans. denied*.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.

---

[16] The copy of the trial court's guardianship termination order contained in Guardian's Appendix does not contain page five. The full copy of the order can be found in the back of Guardian's Brief.