## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 26 2016, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Larry G. Evans
Kevin G. Kerr
Hoeppner Wagner & Evans, LLP
Valparaiso, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Guardianship of K.K.L., C.T.L., Q.C.L., and A.S.L. (minor children), | April 26, 2016 |
| | Court of Appeals Case No. 46A04-1507-GU-921 |
| Dorothy Denise Carroll | Appeal from the LaPorte Circuit Court |
| *Appellant.* | The Honorable Thomas J. Alevizos, Judge |
| | Trial Court Cause No. 46C01-1212-GU-77 |

**Mathias, Judge.**

[1]     Dorothy Denise Carroll ("Carroll") appeals the order of the LaPorte Circuit Court removing her as guardian of the estates of K.K.L., C.T.L., Q.C.L., and A.S.L. (collectively "the Children") and trustee over the Children's trusts. On

appeal, Carroll claims that the evidence does not support the trial court's decision to remove her as guardian of the Children's estates and that the trial court erred by removing her as trustee without giving her notice or an opportunity to be heard on this issue.

We reverse.

## Facts and Procedural History

This case involves the children of John Larkin ("Larkin") and Stacey Larkin ("Stacey"). As we explained in a previous appeal:

> On December 11, 2012, police were dispatched to Larkin's residence following a report of a shooting. When an officer arrived, he found Larkin's wife, [Stacey], deceased in the closet. An autopsy later determined that she died from two gunshot wounds.

*Larkin v. State*, 43 N.E.3d 1281, 1283 (Ind. Ct. App. 2015). Larkin was subsequently charged with voluntary manslaughter.

Carroll is Larkin's sister and the Children's aunt. Carroll is an attorney licensed to practice law in Illinois. She works for the Chicago Park District and manages bond expenditures. Shortly after Stacey's death, Carroll petitioned the trial court to serve as guardian of the persons and estates of the Children. The trial court granted this petition and issued an order on April 11, 2013, stating in relevant part that Carroll "shall serve [as guardian] upon taking an oath and without posting bond." Appellant's App. p. 13. Carroll filed her acceptance and oath on May 29, 2013, and the trial court subsequently issued letters of

guardianship the following day. Carroll was also granted legal and physical custody of the Children.

[5] On August 29, 2014, Carroll petitioned the trial court to establish living trusts for the benefit of the Children. The trial court granted the petition to establish the trusts, and Carroll was appointed as trustee. Thus, Carroll was serving as both guardian of the Children's persons and estates and as trustee of their individual trusts. Larkin disclaimed any interest he had in the proceeds of his late wife's insurance policy, and the trusts were funded with $253,424.66 each from the proceeds of the policy.

[6] On May 3, 2013, Carroll, Larkin, Stacey's parents Scott and Tracy Simon ("the Simons"), and the Department of Child Services ("DCS") filed a joint stipulation regarding the care and custody of the children. The stipulation provided among other things: (1) that the Children should be reunited with their father because they "want to be with him and need the support of a parent after having lost the other parent," (2) that Larkin should participate in family therapy with the Children, (3) that the Children should continue with individual therapy, and (4) that the parties all agreed with the recommendation of the therapist that Larkin return to his residence with the Children. Appellant's App. pp. 19-22.

[7] Stacey's will designated as alternate personal representative Anne Larkin Tuomey ("Tuomey"). Tuomey is Larkin's sister and thus Stacey's sister-in-law and lives in Massachusetts. On June 20, 2013, Tuomey appointed Carroll as her

resident agent, listing the Larkin family home as Carroll's address. After being appointed as guardian and trustee in early 2013, Carroll took time off from work under the federal Family and Medical Leave Act ("FMLA") and began to live with the Children at their family home for approximately thirteen weeks. She then began to see the Children less frequently but still approximately ten times per month.

[8] On March 18, 2015, Carroll filed a verified petition seeking to obtain the trial court's approval to purchase the Children's family home from Larkin. The petition alleged that Larkin was having financial difficulties because he was unable to obtain employment due to a pending charge of voluntary manslaughter arising from Mother's death. The petition also alleged that, because of this charge, the home was on the verge of foreclosure. An appraiser's report valued the home at $850,000 for the real property alone. Carroll negotiated a price of $650,000 to purchase the home and all of its contents, including furniture. In exchange for permission to continue to live in the home, Larkin also agreed to pay property taxes, insurance, and utilities totaling over $1,200 per month. Even though the trust document contained no requirement that Carroll seek trial court approval of the purchase, she sought such approval because the transaction involved her brother.

[9] The trial court held a hearing on Carroll's petition on May 13, 2015. Counsel for the Simons also appeared at the hearing and stipulated that the Children had been raised in the home and that it was in the best interests of the Children to remain in the home. The Simons, however, stated that they had insufficient

information to determine whether purchasing the home from Larkin was in the best financial interests of the Children.

[10] Carroll presented the testimony of Toni Henke-Wheeler ("Henke-Wheeler"), who provided family and individual counseling to the Children. Henke-Wheeler testified that the Children were dealing with grief stemming from the death of their mother, their father's alleged role in the death of their mother, and the perceived "loss" of their mother during the latter part of her life due to her substance abuse problems. When Henke-Wheeler referred to the "alleged" role Larkin played in the death of the Children's mother, the trial court interrupted her and stated:

> So is the — the involvement isn't alleged. The nature of the involvement is what's at issue. Is that my understanding of the criminal case? So you don't need to [use] alleged there.

Tr. pp. 10-11. Henke-Wheeler was then cross-examined by Larkin's counsel, who asked the question, "Given the fact that the children now only have one parent, their father, in your opinion, if he is removed from their presence, what impact would his absence have on the children?" Tr. p. 14. Before Henke-Wheeler could respond, the trial court objected *sua sponte*, stating "It's irrelevant. You don't have to object. It's irrelevant." *Id*.

[11] The court then denied the petition from the bench, stating, "The Court denies the request. There are adequate places you can rent, buy, purchase to stay in the same neighborhood and in the same schools." *Id*. at 16. The trial court issued an order that same day providing in part:

1.  The Petition alleges that the Larkin family home is in danger of being "foreclosed upon." However, Guardian offered no evidence to substantiate that claim.

2.  The only evidence presented was the testimony of Toni Henke-Wheeler, ACSW/LCSW, the children's social worker. Ms. Henke-Wheeler testified that it is in the children's best interest to maintain their neighborhood, friends and school. Upon cross-examination, she reiterated that school was the principal focus. She also indicated that she had no knowledge as to the children's financial interests.

3.  Absent from the presentation of evidence was discussion of the effect that this large expenditure might have regarding funds needed for the children's education, therapy, medical or other future needs.

4.  Also absent was a discussion, assuming the house is in danger of being lost, of how the children could maintain their neighborhood, friends and school without spending $650,000 ($460,000 for the note and $190,000 to father). There was no evidence of any other housing options being pursued.

5.  Even if the Guardians proved the house was in danger of being lost and the house itself was important to the interest of the children, there are numerous other ways this could be accomplished short of having the children's trust, pay $190,000 to the man allegedly criminally responsible for the death of their mother. Amongst those, the Guardian could have requested the expenditure of some funds to help pay the mortgage. Also, the trust could pay off the note and take a mortgage back. There was no evidence that any of this was contemplated.

6.  The Guardian is the father's sister. The CASA office indicated none of this proposal was discussed with the children's CASA.

7.  The Guardian has not proven that it would be in the children's best interest to have the trust purchase the family home for $650,000.

Appellant's App. pp. 115-16. Carroll did not appeal this order and did not purchase the home.

[12] On May 20, 2015, the trial court *sua sponte* ordered Carroll to appear and show cause why she should not be removed as guardian of the Children's estates and as personal representative of the estate of Stacey Larkin.[1] The trial court cited the following reasons for its order:

1. It appears from the Chronological Case Summary that [Carroll] has not filed an accounting;

2. [Carroll] caused to be filed a petition to have the wards' trust purchase her brother, John Larkin's, house. The Court finds this as evidence that she was more interested in her brother's fiduciary interest than the fiduciary interests of the wards.

3. More importantly, [Carroll] did not, in her capacity as personal representative/Guardian, file a lawsuit against (her brother) John Larkin, who is the individual charged with the homicide of the wards' mother (and the Estate's decedent). It appears that the statute of limitations has now passed for her to attempt to bring suit at this time.

Appellant's App. pp. 117-18.

[13] A hearing was held on the trial court's show cause order on June 8, 2015. At the beginning of the hearing, the trial court informed the parties, "I'm more interested in finding out why it seems that the guardian and the estate seem to

---

[1] As explained below, Carroll was, in fact, not the personal representative of Stacey's estate.

be working for John Larkin as opposed to his children who are the estate of Stacey Larkin, and I want some explanations." Tr. p. 23.

[14] Carroll testified and explained that, at the outset of the guardianship, she or Larkin paid for the Children's expenses. She later hired counsel to work with Stacey's insurer to ensure that the Children received the proceeds of Stacey's life insurance. Carroll then took these proceeds and placed them in an account with Chase Bank. She also spoke with a bank employee about investing the trust funds but backed out when the bank's fees were higher than what she had been led to believe. She also thought that it was a poor time to invest and did not want to "get in at the top of the market." Tr. p. 39. Carroll testified that she thought purchasing the home would be a good investment of the trust assets because "they would be getting a 20 percent -- really a 24 percent return immediately." Tr. p. 40. She stated she had sought the court's approval, and "if the Court said no, then it's not a good idea." *Id.* at 52.

[15] Carroll's counsel also explained that she had not yet filed an accounting because he calculated the start of the guardianship from the date Carroll received her letters of guardianship, not the date of the trial court's order approving the appointment. Accordingly, counsel thought the accounting was not due until the end of June 2015. When notified of the issue by the trial court's show cause order, Carroll's counsel filed a complete accounting as to one of the Children and a partial accounting as to the others. Counsel expected the complete accounting on the remaining children to be completed "very

shortly."[2] Tr. p. 24. The trial court took the matter under advisement and, on June 17, 2015, issued an order that stated in relevant part:

> The Court, having moved sua sponte, for rule to show cause, makes the following additional findings:
>
> 1. The probate court may remove a guardian who has failed to perform a duty imposed by law or lawful order of the court or has other wise proven unsuitable of discharging her responsibilities. *See Carr v. Carr*, 685 N.E.2d 92, 97 (Ind. Ct. App. 1997). *See also* Ind. Code § 29-3-12-4(a); Ind. Code § 29-1-10-6.
>
> 2. Dorothy Denise Carroll, by her own testimony, admits that no due diligence was made regarding whether the house was in danger of being foreclosed upon. The only source of the foreclosure information comes from her brother, Mr. John Larkin. This fact alone counters Dorothy Denise Carroll's assertion that she acted with due diligence in attempting to have her wards' estates purchase the home from John Larkin. To date, the Court has been presented no other evidence that the mortgage holder was threatening foreclosure regarding the house. Had Dorothy Denise Carroll actually attempted to do "due diligence" in this regard, she would have been in the position to either ascertain that foreclosure was not impending or if it was, to discuss alternative solutions with the mortgage lender and John Larkin.
>
> 3. Although Dorothy Denise Carroll indicates that her experience has allowed her to be a great steward of her wards' estate, the evidence is that the estates' holdings are all in a rudimentary account at J.P. Morgan Chase earning less than the rate of inflation (.80%).

---

[2] Accountings as to all the Children were filed on July 1, 2015.

4. Although Dorothy Denise Carroll is a licensed attorney (admittedly in Illinois), Dorothy Denise Carroll has indicated that she was unaware of the deadline for filling an accounting. However, even though the Courts' Rule to Show Cause informed her of her failure to meet the deadline, to date only a partial accounting has been filed.

5. Dorothy Denise Carroll has been serving as a Resident Agent for the Estate of Stacey Larkin (the wards' mother), thus allowing her sister (a Massachusetts resident) to be the Personal Representative. However, Dorothy Denise Carroll admitted under oath that she has not been an Indiana resident during any times relevant to the matters at hand. This troubles the Court and further evinces the Court's belief that she is no longer a person to be Guardian of these Estates.

6. The Court, having appointed Jennifer Koethe as guardian ad litem for the wards, and previously appointed a LaPorte Court Appointed Special Advocate (CASA) to the wards, hereby removes Dorothy Denise Carroll as guardian of the wards' estate and appoints Harbor Trust as Corporate Guardian of the wards' estate without bond as the Court finds that bond is not necessary.

7. The Court ORDERS the GAL and CASA to submit a report within thirty (30) days of this Court Order and recommend whether Dorothy Denise Carroll should remain Guardian of the Wards' person.

8. Dorothy Denise Carroll is NOT absolved from providing a complete accounting record of the wards' estate to the court. This accounting shall be submitted to the Court no later than July 1, 2015.

9. The clerk shall issue to Harbor Trust upon guardian's filling [sic] of Oath and Acceptance as stated under Ind. Code § 29-3-7-3(2)(A) and (B).

IT IS, THEREFORE, ORDERED that these additional findings of fact be entered, that Dorothy Denise Carroll be removed as

guardian of the wards' estate, that Harbor Trust be appointed Corporate Guardian's of the wards' estate and that the GAL and CASA submit a report regarding whether Dorothy Denise Carroll should remain guardian of the wards' person, that Dorothy Denise Carroll must submit a complete accounting report to the Court no later than July 1, 2015 and that the clerks issue a letter to Harbor Trust upon guardian's filling [sic] of Oath and Acceptance.

Appellant's App. pp. 7-8.

[16] On July 21, 2015, the GAL filed a motion to clarify the court's June 17 order. Specifically, the GAL sought to clarify whether the trial court had removed Carroll as trustee in addition to removing her as guardian of the Children's estates. The trial court responded on July 24, 2015, entering an order removing Carroll as trustee of the Children's trusts.[3] Carroll now appeals.

## Standard of Review

[17] Carroll first argues that the trial court improperly removed her as guardian of the Children's estates. Decisions in guardianship proceedings are within its discretion of the trial court. Ind. Code § 29-3-2-4(a) ("[A]ll findings, orders, or other proceedings under this [guardianship] article shall be in the discretion of the court unless otherwise provided in this article."); *see also In re Guardianship of M.N.S.*, 23 N.E.3d 759, 765 (Ind. Ct. App. 2014). Accordingly, we review the trial court's order only for an abuse of this discretion. *Id*. On appeal, we will not

---

[3] On September 8, 2015, the trial court granted Carroll's motion for a change of judge and recused himself, and a special judge was appointed on September 25, 2015.

reweigh the evidence nor will we reassess the credibility of witnesses; instead, we will consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* at 766.

[18] Tempering this deferential standard of review is the fact that only Carroll has filed an appellate brief. When the appellee fails to submit a brief, we will not undertake the burden of developing an argument on her behalf. *Geico Ins. Co. v. Graham*, 14 N.E.3d 854, 857 (Ind. Ct. App. 2014) (citing *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006)). Instead, we will reverse the trial court's judgment if the appellant's brief presents a case of *prima facie* error. *Id.* In this context, *prima facie* error is defined as, "at first sight, on first appearance, or on the face of it." *Id.* (quoting *Fang*, 848 N.E.2d at 1068)). This "*prima facie* error rule" protects the court on appeal and takes from us the burden of controverting arguments advanced for reversal, a duty which remains with the appellee. *Id.*

## I. Removal of Carroll as Guardian of the Children's Estates

[19] Carroll claims that the trial court abused its discretion in removing her as guardian of the Children's estates. From the language of the order, it is evident that the trial court based its decision to remove Carroll as guardian on four grounds: (A) that Carroll had not diligently researched the financial soundness of purchasing Larkin's home; (B) that Carroll had invested the Children's money in an account that earned little interest; (C) that Carroll had not timely filed the accountings required by the guardianship statutes; and (D) that Carroll

was serving as resident agent of the personal estate of Stacey Larkin even though she was not currently living in Indiana.[4]

*A. Request to Purchase Larkin's Home*

[20] With regard to the first basis for the trial court's decision, Carroll argues that she presented evidence that the home was appraised at $850,000 without its contents and that she had negotiated a price of $650,000 for the house and its contents, in addition to allowing Larkin to live in the home in exchange for paying taxes, insurance, and utilities totaling $1,200. Of course, the trial court did not have to credit the testimony that the house was on the verge of foreclosure, and the trial court rightly noted that Carroll presented no evidence that she had offered to simply pay the mortgage payments or the balance of the note, as opposed to a deal which gave her brother almost $200,000 in profit. However, all the parties, even Stacey's parents, agreed that it was in the best interests of the Children to stay in their family home. Also, the Children's therapist thought that the Children should stay in their family home to assist in the process of dealing with the loss of their mother.

[21] We also note that Carroll did not purchase the home from her brother. All she did was request the trial court's approval of the purchase. We agree with Carroll that simply seeking the trial court's approval should not be considered as a

---

[4] Carroll is correct to note that the trial court's inquiry into why she had not considered filing a wrongful death claim against Larkin on behalf of the Children was misplaced because she was not the personal representative of the estate of Stacey Larkin. The trial court, however, acknowledged this at the hearing and did not base its decision to remove Carroll as guardian on this basis.

reason for removing her as guardian of the Children's estates. *See Fletcher Trust Co. v. Hines*, 211 Ind. 111, 118, 4 N.E.2d 562, 565 (1936) ("Although it is not necessary to obtain a court order to sell, it is certainly the wise and sound policy on the part of a guardian to secure such an order not only for the protection of the ward's interest, but also for his own."). Although her proposal might not have been the most financially prudent way for the Children to remain in the family home, it was not so unreasonable that simply seeking the trial court's approval justifies removing her as guardian.

*B. Investment of Children's Funds*

[22] Carroll also takes issue with the trial court's criticism of her decision to invest the Children's funds in a bank account earning only 0.8% interest, which the trial court believed was less than the rate of inflation. Carroll notes that no evidence was presented regarding the rate of inflation. Moreover, we may take judicial notice[5] that the rate of inflation for 2015, as calculated by the federal Bureau of Labor Statistics, was 0.1187%. *See* http://www.bls.gov/data/ inflation_calculator.htm. Thus, the trial court was factually incorrect in concluding that the interest rate was less than the rate of inflation and should not have held the low rate of interest on the accounts against Carroll.

---

[5] *See Vore v. Vore*, 563 N.E.2d 154, 157 (Ind. Ct. App. 1990), *aff'd*, 573 N.E.2d 397 (Ind. 1991) (approving trial court's taking judicial notice of economic inflation); 31A C.J.S. Evidence § 140 (noting that courts have taken judicial notice of historical inflation rates).

## C. Guardianship Accounting

The trial court also faulted Carroll for failing to file an accounting for the guardianships in a timely fashion. On appeal, Carroll argues that she did file the accountings on time, and even if she did not, she had a good faith basis for doing so, and no harm resulted. The relevant statute provides that, unless otherwise provided by the court, a guardian "shall file with the court . . . at least biennially, not more than thirty (30) days after the anniversary date of the guardian's appointment . . . a verified account of the guardian's administration." Ind. Code § 29-3-9-6(a)(1). Thus, Carroll was required to file an accounting of her guardianship no later than thirty days after the two-year anniversary of her appointment. The confusion here arises from the calculation of the anniversary of Carroll's appointment as guardian.

Carroll notes that the trial court's guardianship appointment order provided that Carroll "*shall serve upon taking an oath*[.]" Appellant's App. p. 13. This tracks the statutory requirement letters of appointment of a guardian may be issued only after the guardian takes an oath. *See* Ind. Code § 29-3-7-3(a)(1). Carroll filed her acceptance and oath on May 29, 2013. Thirty days from the two-year anniversary of this date is June 28, 2015. The trial court issued its show-cause order on May 20, 2015. Therefore, no accounting was yet due, nor was the accounting due at the time of the show-cause hearing on June 8, 2015, yet Carroll had already filed a complete accounting for one of the children and a partial accounting for the other children as of the hearing date. Accordingly, the trial court should not have considered that Carroll had not yet filed her

guardianship accountings as evidence that Carroll had not been diligent in her role as guardian.

### D. Carroll Serving as Resident Agent

[26] The trial court also faulted Carroll for serving as resident agent of the Estate of Stacey Larkin even though she admitted that she was currently living in Chicago, Illinois. Pursuant to Indiana Code section 29-1-10-1(d)(2), a nonresident may serve as a personal representative if the nonresident meets certain qualifications, including "notice of the appointment of a resident agent to accept service of process, notices, and other documents." We are unable to find a statutory definition of "resident agent" in the probate code, but Carroll argues on appeal that she could still serve as a resident agent even if her domicile was not in Indiana.

[27] First, we think that this is only tangentially related to Carroll's role as guardian. Moreover, the evidence was uncontroverted that, immediately after Stacey Larkin's death, Carroll took time off under the FMLA and did reside with the Children in Indiana for several weeks. Even after she moved back to Illinois, Carroll spent approximately ten days per month with the Children in Indiana. Carroll's address as resident agent was the Larkin family home. Therefore, she was still able to accept service of process, notices, and other documents as required by statute. Although we do not condone Carroll's acting as a resident agent while not residing in Indiana, without any evidence of any resulting harm, we cannot say that this is grounds for removing her as guardian of the Children's estates.

[28] In short, Carroll has established *prima facie* error in the trial court's order removing her as guardian of the Children's estates.

## II. Removal of Carroll as Trustee of the Children's Trusts

[29] Carroll also claims that the trial court erred when it removed her as trustee of the Children's trusts. Carroll notes that the trial court's show-cause order did not mention anything about the potential of removing her as trustee, nor did the trial court's initial order removing Carroll as guardian mention removing her as trustee. Instead, on July 21, 2015, the GAL filed a motion seeking to clarify whether the trial court's order removed Carroll as trustee in addition to removing her as guardian of the Children's estates. The trial court responded on July 24, 2015, entering an order removing Carroll as trustee of the Children's trusts.

[30] We agree that Carroll has established *prima facie* error in the trial court's order removing her as trustee because she had no notice that her status as trustee was at issue. *See State ex rel. Anderson-Madison Cty. Hosp. Dev. Corp. v. Superior Court of Madison Cty.*, 245 Ind. 371, 381, 199 N.E.2d 88, 93 (1964) (holding that removal of trustee was improper where the removal was *sua sponte*, without specific charges being filed and notice being given, and without a reasonable opportunity for the trustee to be heard); *In re Kilgore*, 120 Ind. 94, 22 N.E. 104, 106 (1889) (holding that trustee had right to due notice and an opportunity to be heard before being removed as trustee). Without giving Carroll notice and without holding a hearing on the issue, the trial court could not properly remove Carroll as trustee.

## Conclusion

Carroll has established *prima facie* error in the trial court's order removing her as guardian of the Children's estates and the trial court's order removing her as trustee of the Children's trusts.

Reversed.

Kirsch, J., and Brown, J., concur.