## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 21 2017, 8:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Michelle Lewis
Monticello, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| M.L., <br> *Appellant-Defendant,* <br><br> v. <br><br> B.M., et al., <br> *Appellees-Plaintiffs* | June 21, 2017 <br><br> Court of Appeals Case No. 41A04-1612-GU-2700 <br><br> Appeal from the Johnson County Superior Court <br><br> The Honorable Kevin Barton, Judge <br><br> Trial Court Cause No. 41D01-1303-GU-29 |

**Altice, Judge.**

### Case Summary

[1]     M.L. (Mother) appeals, pro se, the trial court's order denying her petition for termination of a guardianship over her teenage son (Child) held by B.M. (Grandmother) and M.M. (collectively, Grandparents).  Mother presents a

number of arguments on appeal, but we determine the essence of her argument to be that the trial court abused its discretion by denying her petition.

We affirm.

### Facts & Procedural History

Child was born February 14, 2001, during the marriage of Mother and T.P. (Father). Mother and Father divorced while living in Colorado when Child was about eight years old. Father maintained custody of Child, and Mother exercised parenting time, which was sometimes sporadic. Mother has never paid support for Child.

Due to a long history of seizures, Mother does not have a driver's license. Her medical condition also affects her ability to maintain employment. She moved a number of times within Colorado following her divorce.

Father remarried in 2011 and had a daughter with his new wife in Colorado. From 2011 to 2013, Mother's visits with Child were infrequent. Throughout his childhood, Child regularly visited and spent summers with Grandparents – his paternal grandmother and step-grandfather – in Indiana. Father had a tumultuous relationship at times with each of his wives, and Grandparents offered refuge and stability for Child.

In February 2013, Father sent Child to stay with Grandparents. Father then committed suicide on February 19, 2013, in Colorado. Grandparents notified Mother and bought a plane ticket for her to move back to Indiana in March.

Mother was not healthy enough or financially secure to take custody of Child, so she consented to Grandparents' guardianship. On April 1, 2013, an order appointing Grandparents as guardians over Child was entered.

[7] Mother and Grandparents had a good relationship, and Grandparents did not restrict Mother's access to Child. They even assisted in transportation for parenting time, as Mother did not live in the same town and could not drive. Mother was always welcome in Grandparents' home.

[8] Mother met M.S. in July 2013 and introduced him to Child about a month later, indicating that she was going to marry M.S. and regain custody of Child. Thereafter, on August 22, Mother forwarded to Grandmother a bio Mother had received from M.S. when they met online. Something just did not seem right to Grandmother, so she performed an internet search using M.S.'s name. She learned that M.S. had committed a string of bank robberies in 2008. M.S. was described in an article as a "troubled man with mental-health issues" who had also "victimized relatives". *Exhibits*, Exhibit P-5. Further, while at an inpatient mental health center awaiting trial on the robbery charges, M.S. left the facility and robbed another bank to cover a bar bill. Along with the imposition of a four and one-half year federal prison sentence in August 2009, M.S. was ordered to undergo psychiatric treatment in prison. M.S.'s mental health issues apparently included "major depression, chronic bi-polar disorder, chronic schizoaffective disorder, and alcoholism." *Exhibits*, Exhibit P-7.

[9]     After discovering this information, Grandmother became concerned and notified Mother via email on August 28, 2013. Mother confronted M.S. that night about his undisclosed criminal past and mental health issues. She then contacted Grandmother the following day to express that M.S. was a changed man and deserves a second chance. Grandmother responded in part:

> I believe that people can change and that they deserve a chance to prove they are changed. However, I don't believe that you have known [M.S.] long enough to know for sure if he is changed. And from what you have told me, it doesn't sound like he was honest with you about his past until you confronted him about my e-mail. The bio you shared with me from [M.S.] certainly does not indicate his criminal past or his mental illness or his alcoholism. I am willing to give him time to prove he is a changed man, but I am not willing to take chances with [Child's] safety…. It would certainly be in [Child's] best interest and yours for you to get to know [M.S.] well enough to know for sure if he is being honest with you and that he is changed….
>
> [We] are willing to bring [Child] up to visit as long as [M.S.] is not going to be there; but until we are more comfortable with this situation, we will be staying in Lowell and bringing him back home. We believe this is the best right now since you don't see anything wrong with this situation.
>
> You have always been welcome in our home, and still are if you want to come here sometimes to visit….

*Exhibits*, Exhibit P-3. Mother and M.S. married in October 2013.

[10]    The relationship between Mother and Grandmother became strained when Grandmother restricted visits and requested certain information regarding M.S.

that Mother and M.S. refused to provide. Grandparents' home remained open for visits, but Mother refused to spend the night there "[a]s a matter of principle" because M.S. was not welcome. *Appellant's Brief* at 9. Additionally, Grandparents drove Child to visit Mother for holidays and special occasions, but after December 2013, they would not allow overnight stays. In sum, Mother did not see Child regularly after marrying M.S. Mother's communication with Child became primarily through text messages.

[11] On June 1, 2016, more than three years after Grandparents obtained custody of Child, Mother filed a petition for termination of guardianship. In the petition, Mother claimed that she was now financially, emotionally, and mentally able to provide a stable and supportive home for Child.

[12] In a series of text messages in early August 2016, Mother and Child discussed whether Child wanted to move and live with Mother and M.S. Child indicated that he was comfortable with his life and wished to stay with Grandparents. Child was sad because he did not want to hurt Mother or have her blame Grandmother for his decision.

[13] A brief evidentiary hearing on the petition was held on September 1, 2016, at which Mother represented herself and Grandparents were represented by counsel. In addition to Mother and Grandmother testifying, exhibits were admitted into evidence and the trial court conducted an in-camera interview with Child – who was then fifteen years old. The court then took the matter under advisement.

[14]  On October 3, 2016, the trial court issued its order denying Mother's motion to terminate the guardianship. The court recognized that Mother's epilepsy was being addressed through medication and that she now had a stable residence as a result of her marriage. Based on the strong emotional bond between Child and Grandparents and Child's lack of a close relationship with Mother, however, the court concluded that Grandparents had established by clear and convincing evidence that the guardianship should continue. The court continued:

> A relationship between Mother and [Child] needs to be normalized as a precondition to termination of guardianship. Regular visitation needs to be established. Mother has made clear that her husband will be involved in visitation. From the evidence, the Court does not find that [Grandparents] have established endangerment of the child's physical condition or significant impairment of emotional development under Indiana Code 31-17-4-1. While [M.S.] does have a prior history of mental illness and criminal convictions, the evidence is that the mental illness is controlled by medication and the character statements offered by Mother into evidence are not adverse to establishment of visitation.

*Appendix* at 9-10. Accordingly, the court granted Mother parenting time in accordance with the Indiana Parenting Time Guidelines.

## Discussion & Decision

[15]  Mother's pro-se arguments on appeal are all over the place. She asserts that the trial court's findings are clearly erroneous but then does not attack any specific findings of fact. She also claims that the trial court based its decision on

"distorted conception of the facts." *Appellant's Brief* at 7. Mother argues that Grandparents alienated Child from her as a result of the restrictions they imposed on the exercise of her parenting time. She also asserts, without further explanation, that the trial court failed to take into account "any of the undisputed claims of wrong doings of [Grandparents] that have gone unanswered. i.e. constructive fraud, perjury and contempt." *Id*. at 10. Finally, Mother claims that the trial court was not impartial because it conducted an in-camera interview of Child and that the court committed fundamental error.

[16] We remind Mother that a pro-se litigant is held to the same standards as a licensed attorney. *See Basic v. Amouri*, 58 N.E.3d 980, 983 (Ind. Ct. App. 2016). Where a litigant fails to present cogent arguments on appeal, we will not become an advocate for that party or address arguments that are inappropriate or too poorly developed or expressed to be understood. *Id*. at 984. Waiver notwithstanding, we will address whether the trial court abused its discretion by refusing to terminate the guardianship.

[17] Trial court orders in guardianship proceedings are reviewed for an abuse of discretion with a preference for granting latitude and deference to our trial courts in family law matters. *In re Guardianship of M.N.S.*, 23 N.E.3d 759, 765-66 (Ind. Ct. App. 2014). In determining whether the court abused its discretion, we review its findings and conclusions, and we may not set aside the findings or judgment unless they are clearly erroneous. *Id*. at 766. We will not reweigh the evidence nor reassess the credibility of witnesses; instead, we will consider the

evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.*

[18] "In a custody dispute between a natural parent and a third party, there is a strong presumption in all cases that the natural parent should have custody of his or her child." *In re Guardianship of B.W.*, 45 N.E.3d 860, 866 (Ind. Ct. App. 2015). In a termination of guardianship proceeding, once the natural parent meets his or her minimal burden of persuasion – which was met in this case – the guardian must prove by clear and convincing evidence that the child's best interests are substantially and significantly served by continued placement with the guardian. *See In re Guardianship of M.N.S.*, 23 N.E.3d at 766. Our Supreme Court has explained this burden as follows:

> The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because "a third party could provide the better things in life for the child." In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person.

*In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002) (citations omitted).

[19]     In the instant case, the trial court determined that Mother was not unfit to care for Child and that the stability issues that had led to the guardianship no longer existed. Despite this, the court concluded that it was clearly and convincingly in Child's best interests to remain with Grandparents. This conclusion was based on the strong emotional bond Child had formed with Grandparents and his lack of a close relationship with Mother. Additionally, the trial court noted that Child would likely have difficulty transitioning to a public-school setting, which would occur if Mother obtained custody.

[20]     Mother complains that the relationship issues with Child were caused by Grandparents' restriction of her parenting time after she married M.S. The record does not compel – and the trial court did not make – such a finding. Certainly, Mother bore much of the responsibility for the quality of her relationship with Child. She and M.S. steadfastly refused to provide Grandparents with information to alleviate concerns regarding M.S.'s alarming past. Mother also rejected opportunities to spend time with Child at Grandparents' home, where she had always been welcomed. Essentially, for at least two years, she acquiesced in seeing Child only on special occasions and otherwise communicating with him through text messages. Mother waited until June 2016 to file her petition to terminate the guardianship and to challenge the restrictions imposed on her parenting time. By this time, Child was fifteen and had formed a much stronger bond with Grandparents than Mother, who had not had custody of Child since her divorce from Father when child was an eight-year old.

The trial court's determination was, of course, influenced by its in-camera interview with Child. Despite Mother's protests below and on appeal, there was nothing improper about the trial court speaking to the fifteen-year old about his desires regarding custody. *See* Ind. Code § 31-17-2-8(3) (in making custody determinations, trial court shall consider "[t]he wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age").

Although the trial court denied the petition to terminate the guardianship, it recognized the need to establish regular parenting time between Mother and Child. To this end, the court found that the evidence did not establish that parenting time by Mother would endanger Child's physical health or significantly impair his emotional development. *See* I.C. § 31-17-4-1(a). Accordingly, the trial court granted Mother parenting time in accordance with the Indiana Parenting Time Guidelines.

On this record, we cannot conclude that the trial court abused its discretion when it denied Mother's petition to terminate the guardianship.

Judgment affirmed.

Kirsch, J. and Mathias, J., concur.